332 S.W.3d 793 (2011)
In re the ADOPTION OF C.M.B.R., a minor.
S.M. and M.M., Respondents,
v.
E.M.B.R., Appellant.
No. SC 91141.
Supreme Court of Missouri, En Banc.
January 25, 2011.
*800 Christopher M. Huck of Peterson Young Putra PS, R. Omar Riojas of DLA Piper LLP in Seattle, WA, William J. Fleischaker of Fleischaker & Williams LC, Joplin, for the mother.
Richard L. Schnake of Neale & Newman LLP, Springfield, Joseph L. Hensley of Hensley & Nicholas LLC, Joplin, for adoptive parents.
Jamey Garrity, guardian ad litem, Joplin, for the child.
Brenda Elliston of the Elliston Law Offices, Webb City, for Jasper County juvenile officer.
John de Leon, Chaves & de Leon PA, South Miami, FL and Gaylin Carver, Carver & Michael LLC, Jefferson City, for The consulate general of Guatemala.
Anthony E. Rothert of ACLU of Eastern Missouri, Annette R. Appell of Washington University Law School, St. Louis, Stephen Douglas Bonney of ACLU of Kansas & Western Missouri, Kansas City, for The ACLU of Eastern Missouri, the ACLU of Kansas & Western Missouri and Washington University Law School Civil Justice Clinic.
Maria Woltjen and Jennifer Nagda of project in Chicago and Anthony E. Rothert of ACLU of Eastern Missouri, St. Louis, for The Immigrant Child Advocacy Project at the University of Chicago.
Angela J. Ferguson, Austin & Ferguson LLC, Kansas City, Shari Lahlou, Patricia Connally and Christine Sommer, Crowell & Moring LLP, Washington, D.C., for Legal Momentum.
Fernando Bermudez, Green Jacobson PC, Clayton, Cynthia V. Dixon and Alejandro Aixala of the legal defense fund in Chicago, for The Mexican American Legal Defense Fund.
John C. Holstein and James E. Meadows, Polsinelli Shughart PC, Springfield, Christopher W. Dysard, Linda Imes and Max C. Nicholas, Spears & Imes LLP, New York, NY, for The Women's Refugee Commission.
PATRICIA BRECKENRIDGE, Judge.
E.M.B.R. (Mother) appeals a judgment terminating her parental rights to her son, C.M.B.R. (Child), and granting M.M. and S.M.'s petition to adopt Child because the trial court found she willfully abandoned *801 him. The failure to investigate and file reports prior to the trial on the petition as mandated by sections 211.455, 453.070.1 and 453.077.1 is plain error and requires reversal of the judgment of termination of Mother's parental rights and the grant of adoption.[1] The cause is remanded and, on remand, the court shall order compliance with the reporting requirements of those statutes before retrial on the claims in the petition as they pertain to Mother's parental rights under section 211.447.2(2)(b), whether her consent was required under section 453.040(7), and the adoption of Child by S.M. and M.M.[2]

I. Factual and Procedural Background
This Court views the evidence and permissible inferences drawn from the evidence in the light most favorable to the judgment. Suffian v. Usher, 19 S.W.3d 130, 136 (Mo. banc 2000); Rule 73.01(c). Viewing the evidence in the light most favorable to the judgment, the evidence adduced at the trial was that Mother is a citizen of Guatemala. Mother entered the United States in 2006, when she was pregnant with Child. The father was not involved with Mother at the time of Child's birth. Mother never has revealed the name of Child's biological father.
During her pregnancy, she did not receive prenatal care. She did receive educational services from Laura Davenport, a parent educator for Parents As Teachers in Carthage.[3] Child was born October 17, 2006. A few days later, Ms. Davenport provided a crib for Child because Mother and Child were sleeping on the floor of the apartment of two acquaintances. Mother was not working at the time, and her roommates provided her with food. The living conditions in the home were poor.
Approximately two to three months later, Ms. Davenport visited Mother and Child again. At this time, they were living with Mother's brother, his wife, and their three sons. The conditions of the brother's home also were poor. The brother and his family all lived in one bedroom. At this time, Ms. Davenport noticed that Child "seemed developmentally delayed and a little weak." He had slow muscle development and did not have good head support. Because developmental delays can be the result of poor nutrition, lack of attention, and lack of exercise, she instructed Mother about exercises and "sitting up practice" for Child. At this time, Mother had not obtained a birth certificate for Child, and Ms. Davenport instructed Mother that, without a birth certificate, she could not receive social services including WIC for Child. Child was being fed whole milk, not infant formula, which concerned Ms. Davenport because babies need the extra nutrition that formula provides to be able to develop normally. At the time, Mother was employed, and the family members traded child care.
On May 22, 2007, the United States Department of Homeland SecurityImmigration and Customs Enforcement conducted a raid on a poultry processing plant in Barry County, where Mother was working. She was arrested in the raid. At the time of the raid, Child was 7 months old, *802 and Mother and Child were still living with Mother's brother and his family. As a result of Mother's arrest, Child was left in the care and custody of Mother's brother. Her brother placed Child in the care and custody of Mother's sister because he could not take care of Child. Mother's sister and her husband have two children, who were then 3 and 1/2 years old and approximately 7 months old. They lived in a one-bedroom apartment, and both worked full-time.
While Child was living with Mother's sister, Ms. Davenport referred Mother's sister to Jennifer and Oswaldo Velasco, a local clergy couple, for babysitting services. Initially, the Velascos provided child care for Child while Mother's sister and her husband worked. Child occasionally would spend the night with the Velascos. When the Velascos began watching Child, he had received some immunizations but was behind schedule. He still was having developmental problems in that he was slow to sit up and crawl. After a couple of weeks, the child-care arrangement evolved into almost a full-time placement with the Velascos watching Child all day and night during the week and Mother's sister watching Child on the weekends. After a few weeks, Child only spent a few hours with Mother's sister and her family on Sundays. At some point, Mother's sister asked the Velascos to take care of Child as she and her husband were unable to do so.
On September 9, 2007, Ms. Davenport visited Mother at the St. Clair County jail, where she was being held. A purpose of her visit was to ask if Mother would agree to Child's adoption. Mother refused. In the course of their conversation, Ms. Davenport informed Mother that Child was staying with Mother's sister. Mother told Ms. Davenport that "[she] was surprised that the baby had not stayed with her brother ... [b]ecause she felt like [her brother and his wife] would have been willing to take care of [Child]." Mother did not give any letters to Ms. Davenport to transport to her sister, brother, or Child.
The Velascos were acquainted with M.M.'s relatives. The Velascos knew that S.M. and M.M. (Adoptive Parents), a married couple, wanted to adopt a child because they were unable to have children and they had applied to become foster parents. On September 24, 2007, the Velascos asked the Adoptive Parents if they were interested in adopting Child. On that day, the Adoptive Parents began visiting with Child in the presence of others. Child had his first overnight visit with them on October 3, 2007.
On October 5, 2007, the Adoptive Parents filed a petition in the Circuit Court of Jasper County for transfer of custody, termination of Mother's parental rights, and adoption. At the time they filed the petition, Child was 11 months old. Mother still was incarcerated in the St. Clair County jail in Osceola and had been charged by the federal government with aggravated identity theft.[4] On October 11, 2007, Mother pleaded guilty to one count of aggravated identity theft. She then was sentenced to two years of incarceration and ordered to be deported following her release from prison.[5] Eleven days later, *803 on October 16, 2007, she was served with the summons and petition in this case by the St. Clair County sheriff. From the time the pleadings were served, Mother would have known the location of Child and how to contact Adoptive Parents.
On October 17, 2007, the trial court set a hearing for the next day on the request for transfer of custody and issued a notice of that hearing to Joseph Hensley, Adoptive Parents' counsel, and Jamey Garrity, the Child's appointed guardian ad litem. Mother was not listed on the notice of the hearing to transfer custody, and the notice was not sent to her. Sometime thereafter, Mother was taken into federal custody and transferred to the United States penitentiary in Bruceton Mills, West Virginia.
On October 18, 2007, a hearing was held on Adoptive Parents' request to transfer legal custody of the Child to them. Mother was not present at the hearing, and no counsel had been appointed for her. Following the hearing, the trial court transferred legal custody of Child to the Adoptive Parents. On October 28, 2007, Mother sent Mr. Hensley, Adoptive Parents' attorney, a letter written in English and Spanish stating that she did not want her child adopted, she wanted her child placed in foster care, and she requested visitation.
On December 3, 2007, the trial court appointed James Calton to represent Mother. Notice of appointment of counsel was sent to Mother at the St. Clair County jail; however, service was refused.
After several months, the Adoptive Parents authorized their attorney to find an attorney for Mother who was fluent in Spanish. Aldo Dominguez agreed to represent Mother "when contacted by Joe Hensley, attorney for Petitioners [S.M. and M.M.], in June of 2008." The Adoptive Parents agreed to pay Mr. Dominguez's attorney's fees. On June 13, 2008, the trial court appointed Mr. Dominguez to represent Mother.[6]
Mr. Dominguez first attempted to contact Mother by sending her a letter on July 29, 2008. He then spoke with her by telephone on August 12, 2008. He did not visit her while she was in the federal penitentiary in West Virginia.
Because Mr. Calton had not filed an answer, on September 3, 2008, Mr. Dominguez moved for an extension of time to file an answer to the termination of parental rights, transfer of custody, and adoption petition. In that motion, it is alleged that he was contacted by Mr. Hensley to represent Mother. It asserts that he located Mother within the federal bureau of prisons. It states that Mother did not want her child adopted. Leave was granted to file the answer out of time.
The trial on the petition was held October 7, 2008. Mother was not present, but her attorney, Mr. Dominguez, appeared on her behalf. Mr. Garrity, the Child's GAL, also appeared. Counsel for the juvenile officer, Belinda Elliston, was present. At the trial, M.M., S.M., and Ms. Davenport testified on behalf of the Adoptive Parents.
M.M. testified to the facts surrounding the couples' introduction to Child by the Velascos. She testified that Child was underweight, developmentally delayed, and behind in his immunizations at the time they assumed custody. M.M., who has a limited ability to speak and read Spanish, testified that Mother never attempted to contact them or Child and they never contacted Mother or anyone else in her family. *804 They lived openly with Child, taking him on errands around town, to family functions, and on vacation. She stated that Child became a part of the family, making friends and strong connections with their extended families.
On cross examination, Mr. Dominguez asked M.M. about the safety of their basement apartment. He also questioned M.M. about her childhood sexual abuse by her brother. She stated that her brother was still in her life, he saw Child, and that children's services did not find her brother to be a threat to Child's safety.
S.M. testified about the bonding that had taken place between the Child and him, his wife, and their extended families. On cross-examination by Mr. Dominguez, he testified about his criminal record when he was a teenager and his drug use during that time.
Ms. Davenport testified about the Mother and Child's living conditions and the Child's physical condition before and after Mother's arrest. She stated that he was malnourished and developmentally delayed. She testified that she educated Mother about infant nutrition and developmental exercises. She visited Mother at both the acquaintances' apartment and her brother's apartment. The living conditions at both were poor. Ms. Davenport stated that Mother's brother was unable to care for Child. Because she also provided services to Mother's sister, she saw Child at the sister's home after Mother had been arrested. Mother's sister and her husband worked full-time and were unable to care for Child in addition to their two children. She also stated that she assisted Mother's sister in obtaining the aid of the Velascos in caring for Child and that, after a few weeks, the Velascos cared for Child virtually full time. Ms. Davenport testified about her September 2007 jail visit with Mother, during which she said Mother expressed surprise that her brother was not caring for Child and that she did not want Child to be adopted.
Mr. Dominguez did not call any witnesses on Mother's behalf, but he did cross-examine the Adoptive Parents' witnesses. He proffered into evidence a letter stating that Mother had a person who was willing to care for Child in Guatemala. In his closing argument, he argued that the Mother's incarceration does not alone justify a finding of abandonment. He also argued that because the legal documents served to Mother had not been translated into Spanish, she did not understand the gravity of the situation.
After closing arguments, the trial court terminated Mother's parental rights and approved the adoption. In its oral pronouncement of the judgment, the trial court stated that, from the date of her arrest through the trial, "mother appeared to put forth no effort to locate the child and, in fact, should have known where the child was." The trial court issued its written judgment October 9, 2008. In the written judgment, it found that Mother's consent was not necessary because she willfully had abandoned the Child pursuant to section 453.040(7). The trial court also terminated Mother's parental rights pursuant to section 211.447.2(2)(b), which requires a finding of abandonment. The trial court found that it was in the best interests of the Child to terminate Mother's parental rights and to grant the Child's adoption by M.M. and S.M.[7]
Mother appealed after being granted leave to appeal out of time. After opinion *805 by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

II. Mother's Claims of Error
Mother raises 14 points of trial court error on appeal that she asserts warrant reversal of the judgment and remand for dismissal of the petition and return of the custody of Child to her. Several of her points contain multiple claims of error. These claims of error most easily are understood and addressed by grouping them by the nature of the claim. Her claims are that:
1) The termination and adoption proceedings failed to strictly comply with governing statutes:
 The placement was improper under section 453.014.
 The transfer was improper under section 453.110.
 There was a lack of notice of the hearing to transfer custody of Child pursuant to Rule 44.01(d).
 The Court failed to ensure compliance with the investigation and reporting requirements of sections 211.455, 453.026, 453.070, 453.077, 453.080, and 453.110.
2) The trial court's findings under section 211.447.7 are formulaic and conclusory, contrary to the law, and not supported by the evidence.
3) The trial court misapplied the best interest of the child standard in terminating Mother's parental rights under section 211.447, because the trial court focused on her immigration status, the Adoptive Parents' fitness, and the Child's bonding with Adoptive Parents, instead of her constitutional rights.
4) The findings of abandonment do not comply with the law and are not supported by clear, cogent, and convincing evidence.
5) Mother's due process rights were violated:
 She did not receive notice of the custody hearing or the petition.
 She does not speak or read English. The petition and all process served to her were in English and not her native language, Spanish.
 She was not appointed counsel for the transfer of custody hearing.
 Adoptive Parents were involved improperly in the selection of her appointed counsel, Mr. Dominguez.
 The guardian ad litem and the juvenile officer failed to investigate Mother and to undertake an investigation independent of the Adoptive Parents.
 The combining of the TPR proceeding and the adoption proceeding in the same trial improperly injected the issue of the Adoptive Parents' fitness into the TPR proceeding.
 She did not receive a fair hearing because her immigration status and criminal record were injected into the hearing while the trial court ignored the criminal past of S.M. and the molestation history of M.M.'s brother.
 Her appointed attorneys were ineffective.

III. Failure to Comply with Statutes
Mother alleges that the trial court failed to strictly comply and "scrupulously adhere to" the statutory mandates of chapters 211 and 453. She argues that because of the failure to strictly comply with these statutes, the termination of her parental rights and resulting adoption proceedings are void, so the judgment should be reversed and the adoption petition should be *806 dismissed. In Mother's claims, she conflates the two chapters and ignores the legislative mandate on how to construe each chapter.

A. Interaction between Chapter 211 and Chapter 453
This case is a private action for termination of parental rights and adoption. The prerequisite to any adoption is the consent of natural parents or involuntary termination of parental rights. In re J.F.K., 853 S.W.2d 932, 934 (Mo. banc 1993). Adoptive Parents petitioned for termination of parental rights under section 211.447 and adoption without consent under section 453.040(7). Specifically, count I of the petition requests transfer of custody and "termination of parental rights under chapter 453;" count II seeks termination of parental rights under section 211.447, subsections 2(2)(b), 5(1)(b), 5(2)(d), and 5(3);[8] count III seeks adoption of the Child as being in the Child's best interest. Because Adoptive Parents pleaded a right to termination of parental rights under chapter 211 and adoption without consent under chapter 453, both chapters are applicable to this case, and the differences between the chapters must be explored.
Chapter 211 is utilized primarily by state actors, that is, the division of children's services or the juvenile officer, to take children into protective custody and terminate parental rights. See In re J.F.K., 853 S.W.2d at 934. Prospective parents seeking adoption, however, may seek to terminate parental rights based on chapter 211 provisions in an adoption petition. Section 211.447.6.
Prospective parents also may request a termination of parental rights incident to an adoption action under chapter 453. In re J.F.K., 853 S.W.2d at 934. Chapter 453 does not speak to termination of parental rights; rather, it authorizes adoption without consent or with consent that has the effect of terminating parental rights. Section 453.040 sets out the scenarios in which the consent of a parent to adoption is not required. The Adoptive Parents pleaded that Mother's consent was not required under subsection 7 of section 453.040:
The consent to the adoption of a child is not required of:
* * *
(7) A parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection[.]
When a person alleges that consent of the parent is not required for the adoption under section 453.040, the statutory mandates of chapter 211 are irrelevant to the chapter 453 proceeding unless specifically cross-referenced and mandated by chapter 453. In re S.L.N., 167 S.W.3d 736, 740-41 *807 (Mo.App.2005); e.g., section 453.040(7) (making no mention to chapter 211); see also section 453.040(1) (specifically cross-referencing chapter 211). However, if the prospective parents plead termination of parental rights under chapter 211 in a chapter 453 petition, all statutory requirements for chapter 211 must be met for each chapter 211 claim. See In re S.L.N., 167 S.W.3d at 740-41.

B. Chapter 211 and Chapter 453 Are Construed Differently
The legislature has created different rules for construing the provisions of chapter 211 and chapter 453. Chapter 453, which governs the procedures for the adoption and foster care of Missouri children, has an express rule of statutory construction. Section 453.005 states that the chapter is to be construed "to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home." This Court has noted that
[Chapter 453] is to be liberally construed with a view to promoting the best interests of the child, but such liberal construction is obviously not to be extended to the question of when the natural parents may be divested of their rights to the end that all legal relationship between them and their child shall cease and determine[.]
In re Adoption of R.A.B., 562 S.W.2d 356, 360 (Mo. banc 1978).
Provisions in chapter 211 govern the termination of parental rights. In section 211.443, the legislature explicitly stated how the termination of parental rights provisions of chapter 211 should be construed:
The provisions of sections 211.442 to 211.487 shall be construed so as to promote the best interests and welfare of the child as determined by the juvenile court in consideration of the following:
(1) The recognition and protection of the constitutional rights of all parties in the proceedings;
(2) The recognition and protection of the birth family relationship when possible and appropriate; and
(3) The entitlement of every child to a permanent and stable home.
Unlike chapter 453, which only discusses the best interest of the child in the construction of its provisions, chapter 211 requires a court to consider and protect both the best interest of the child and the constitutional rights of all the parties when construing its termination of parental rights provisions.

C. Deficiencies in Pre- and Post-Transfer-of-Custody Proceedings under Chapter 453
Mother claims there were multiple failures to comply with the statutes and one court rule applicable to the proceedings for the placement and transfer of custody of Child to Adoptive Parents. She claims a failure to comply with section 453.014.1(4) (who may place a minor for adoption), section 453.026 (requirement of a written report regarding child before adoptive parents accept physical custody), section 453.110, (transfer of custody requirements), and Rule 44.01(d) (requirement of five days notice before any hearing on a motion). Specifically, she asserts that: (1) the Velascos do not fall within the authorized "intermediaries" under section 453.014.1(4), and, therefore, they did not have the statutory authority to place Child in the Adoptive Parents' custody; (2) the record does not contain a written report about Child that was created before the Adoptive Parents accepted custody, as required by section 453.026; (3) custody of Child was surrendered and taken before a petition was filed and an order entered *808 pursuant to section 453.110.1;[9] and (4) she did not receive any notice of the hearing to transfer custody of Child in violation of Rule 44.01(d). She argues that these deficiencies render the proceedings void and require reversal of the judgment, dismissal of the Adopted Parents' petition, and return of custody of Child to her.
Mother quotes from In re Baby Girl, 850 S.W.2d 64 (Mo. banc 1993), in support of her claim that Adoptive Parents' failure to comply with all statutory requirements in the judicial proceedings in this case makes the court's order transferring custody void. She asserts that because judicial approval of the transfer of custody of the child was not obtained, "all acts thereafter regarding custody were void from any legal perspective." Id. at 68.
She reads In re Baby Girl too broadly. In that case, this Court found the transfer of custody from birth mother to prospective adoptive parents "illegal from its inception" because the prospective adoptive parents took custody of the child from the hospital where she was born and transported the child to their home state of Arkansas without any person seeking and obtaining judicial approval of the transfer of custody. Id. The Court found that this was "precisely the type of action that the legislature sought to avoid when it enacted [section] 453.110.1." Id.
In contrast, in this case, Adoptive Parents filed their petition for transfer of custody in the circuit court sitting as a juvenile division of the county in which Child was located, and that court entered an order transferring custody of Child to them pursuant to section 453.110.1. Mother challenges the proceedings and resulting order transferring custody because there were deficiencies in those proceedings. She does not claim that no judicial action was filed or that there was no order transferring custody. The proceedings and resulting court order for transfer of custody, even if defective, are not void. While each statute and rule serves a valid purpose, such as to prevent the indiscriminate placement and transfer of custody of the child, see id. at 68 (discussing section 453.110's purpose), a party aggrieved by noncompliance with statutes and rules still must timely raise the error. In re P.G.M., 149 S.W.3d 507, 516 (Mo.App.2004). See also In re Duren, 355 Mo. 1222, 200 S.W.2d 343, 345 (1947); In re Z.L.R., 306 S.W.3d 632, 638 (Mo.App.2010).
The errors Mother asserted occurred in October 2007 when the Velascos surrendered custody of Child to the Adoptive Parents and the proceedings on the Adoptive Parents' request for transfer of custody occurred. Mother first objected to the proceedings and claimed error in the order transferring custody approximately two years later on appeal after entry of the judgment terminating her parental rights and granting adoption of Child by Adoptive Parents. She did not timely protest the lack of investigation and filing of reports, the lack of notice of the transfer-of-custody hearing, or the allegedly improper transfer of custody when the case was pending in the trial court; therefore, her claims of error are not preserved.[10] Because Mother failed to properly preserve her claims, they only can be reviewed for plain error. Rule 84.13(c).
Despite the failure to raise the issue, this Court, in its discretion, may *809 review these claims for plain error. In re Duren, 200 S.W.2d at 345; In re Z.L.R., 306 S.W.3d at 638. "In determining whether to exercise its discretion to provide plain error review, the appellate court looks to determine whether there facially appears substantial grounds for believing that the trial court committed error that is evident, obvious and clear, which resulted in manifest injustice or a miscarriage of justice." In re R.S.L., 241 S.W.3d 346, 351 (Mo.App.2007). Even statutory errors that are evident, obvious, and clear, must result in a manifest injustice or miscarriage of justice. In re Z.L.R., 306 S.W.3d at 638 (noncompliance with section 211.447 had the effect of shifting burden of proof to natural parent and resulted in a manifest injustice).
Here, the statutory errors are evident, obvious, and clear from the record, so the issue is whether they resulted in manifest injustice or a miscarriage of justice. While custody of Child was surrendered and taken before a court order in violation of section 453.110.1 and no investigation and report was ordered and completed as required by section 453.110.2 before the court ordered the transfer of custody, Mother has failed to show a manifest injustice or a miscarriage of justice occurred.
The record shows, and Mother does not dispute, that a transfer of the Child's custody urgently needed to occur. The record shows that Child was in need of food, clothing, shelter, and medical care at the time the trial court ordered transfer of custody to Adoptive Parents. It also shows that the trial court reviewed a report prepared after an extensive investigation of whether Adoptive Parents were qualified to be foster parents, and the content of the report was relevant to their qualifications to take custody of Child. Although Mother's circumstances were not investigated or addressed in any report, she does not contest that she was incarcerated or that her family members' scarce resources and work schedules limited their ability to care for her Child. Moreover, Mother does not claim that Adoptive Parents have not provided appropriately for Child during the time he has been in their custody. She asserts, instead, that she should have had the opportunity three years ago to argue that the Child should have been placed in foster care with someone who would have allowed visitation.
While the record supports Mother's claim that Child's placement with Adoptive Parents had a negative impact on her relationship with Child, that negative impact has been exacerbated significantly by Mother's delay in challenging the transfer-of-custody proceedings. She asserts that she was not accountable for the delay because of her initial lack of counsel, her then ineffective counsel, and her failure to have notice of the transfer-of-custody hearing, all which precluded her from asserting her rights at an earlier time.
As a threshold issue, Mother never requested counsel. Although Missouri recognizes a statutory right to counsel in actions brought to terminate parental rights, the parent must assert that statutory right. Section 211.462.2; section 453.030.12. Section 211.462.2 states:
2. The parent or guardian of the person of the child shall be notified of the right to have counsel, and if they request counsel and are financially unable to employ counsel, counsel shall be appointed by the court. Notice of this provision shall be contained in the summons.
(Emphasis added). Section 453.030.12 states:
12. A birth parent, including a birth parent less than eighteen years of age, shall have the right to legal representation *810 and payment of any reasonable legal fees incurred throughout the adoption process. In addition, the court may appoint an attorney to represent a birth parent if:
(1) A birth parent requests representation;

(2) The court finds that hiring an attorney to represent such birth parent would cause a financial hardship for the birth parent; and
(3) The birth parent is not already represented by counsel.
(Emphasis added). The record shows that the summons gave Mother the required statutory notice that she had the right to request appointment of counsel, but she failed to make any request. While the court of appeals has stated that section 211.464 requires that "[a] parent must make a clear and unequivocal waiver on the record of his or her decision to proceed to trial [on the merits of a TPR petition] without a court appointed attorney," In re B.L.E., 723 S.W.2d 917, 920 (Mo.App.1987), no statute or case has imposed the requirement of an affirmative waiver of counsel for transfer of custody proceedings. So, under sections 453.030.12 and 211.462.2, when Mother learned of the proceedings to transfer custody and had the required statutory notice of her right to counsel, she needed to request appointment of counsel. Despite her failure to do so, the trial court not once, but twice appointed counsel to represent her.
The record also refutes her claim that she did not have notice and could not assert her rights absent appointed, competent counsel. The October 28, 2007, letter Mother sent to Adoptive Parents' counsel shows that she had knowledge of the proceeding and who was involved in it 22 days after the petition was filed and that she was able to send correspondence to Adoptive Parents' counsel despite her incarceration and language barriers.[11]
The prejudice to Mother was exacerbated by the lateness of her claims. As discussed below, her claims of error in failure to comply with sections 453.014.1(6), 453.026, and 453.110, and Rule 44.01(d) would not result in dismissal of the petition but would, instead, require rehearing of the transfer of custody matter, which is not in Child's best interest at this point in the proceeding. Mother has failed to prove a miscarriage of justice or manifest injustice.
Mother's next three claims of error, however, warrant relief under plain error review. She claims there was noncompliance with the mandatory investigations and reporting requirements of sections 211.455, 453.070, and 453.077. Those sections require examination of the fitness of the natural parents, the child's condition before and after placement, the fitness of the adoptive parents, and the filing of written reports to aid the court in adjudicating the propriety of terminating parental rights and the best interests of the child.

D. Failure to Comply with Section 211.455
Mother asserts that the trial court did not comply with section 211.455 and, therefore, the judgment must be reversed, the adoption petition must be dismissed, and the custody of Child must be returned to her. Section 211.455 mandates an investigation and written report after a petition to terminate parental rights is filed *811 under chapter 211 to help the court determine if termination is in the best interest of the child. The relevant portions of section 211.455 state:
1. Within thirty days after the filing of the petition, the juvenile officer shall meet with the court in order to determine that all parties have been served with summons and to request that the court order the investigation and social study.
* * *
3. The court shall order an investigation and social study except in cases filed under section 211.444. The investigation and social study shall be made by the juvenile officer, the state division of family services or a public or private agency authorized or licensed to care for children or any other competent person, as directed by the court, and a written report shall be made to the court to aid the court in determining whether the termination is in the best interests of the child. It shall include such matters as the parental background, the fitness and capacity of the parent to discharge parental responsibilities, the child's home, present adjustment, physical, emotional and mental condition, and such other facts as are pertinent to the determination. Parties and attorneys or guardians ad litem or volunteer advocates representing them before the court shall have access to the written report. All ordered evaluations and reports shall be made available to the parties and attorneys or guardians ad litem or volunteer advocates representing them before the court at least fifteen days prior to any dispositional hearing.
The requirements of section 211.455 are mandatory, and the investigation and social study must be ordered after the termination petition is filed. In re C.W., 211 S.W.3d 93, 98 (Mo. banc 2007). When a court fails to strictly comply with applicable provisions of chapter 211, the failure constitutes reversible error. Id. at 98; In re K.A.W., 133 S.W.3d 1, 19-20 (Mo. banc 2004). The judgment is not void; jurisdiction over the child is not removed from the trial court.[12]In re D.O., 315 S.W.3d 406, 408 (Mo.App.2010); In re T.A.L., 328 S.W.3d 238, 253-54 (Mo.App. 2010).
Because the Adoptive Parents sought termination of Mother's parental rights under section 211.447, the trial court was required to order a section 211.455 investigation and social study, but no written report was made to the court prior to its termination of Mother's parental rights under section 211.447.[13] The trial court's failure is reversible error that amounts to a manifest injustice because the reports educate the trial court as to "the parental background, the fitness and capacity of the parent to discharge parental responsibilities, the child's home, present adjustment, physical, emotional and mental condition, and such other facts as are pertinent to the determination." Section 211.455.2. Without these reports, Mother's and Child's circumstances were not briefed fully for the trial court. Its judgment, entered without this information, was manifestly unjust.
*812 The termination of Mother's parental rights under section 211.447 is reversed because of the trial court's failure to comply with section 211.455. The case is remanded for compliance with section 211.455 and then a new trial. Because of this finding of plain error, Mother's other claims regarding compliance with section 211.447 are moot.

E. Failure to Comply with Sections 453.070 and 453.077
Mother claims that the trial court plainly erred by failing to order and review investigations and written post-placement assessments of the Child and the Adoptive Parents as required by sections 453.070 and 453.077. She asserts that because the trial court did not strictly comply with the statutory requirements, custody of the Child should be returned to her and the adoption petition should be dismissed.
Under section 453.070.1, an adoption decree may not be entered until the juvenile division receives and reviews written reports about the adoptive parents and the child's suitability for adoption. This section mandates an investigation and written report. It states:
[N]o decree for the adoption of a child under eighteen years of age shall be entered for the petitioner or petitioners in such adoption as ordered by the juvenile court having jurisdiction, until a full investigation, which includes an assessment of the adoptive parents, an appropriate postplacement assessment and a summary of written reports as provided for in section 453.026, and any other pertinent information relevant to whether the child is suitable for adoption by the petitioner and whether the petitioner is suitable as a parent for the child, has been made.[14]
Section 453.070's investigation and report may be waived if the child is the natural child of one of the adoption petitioners or the natural parents have consented to the adoption. Section 453.070.5. In all other cases, the trial court shall order the division of family services, a juvenile officer, a licensed child-placement agency, a social worker, or any "other suitable person appointed by the court" to conduct the investigation and create a written report. Section 453.070.2. The written report "shall be submitted to the court within ninety days of the request of the investigation." Id.
Section 453.077 mandates a post-placement assessment to be conducted six months after the child has been placed in the custody of the adoptive parents. Any person authorized under section 453.070 or the person who conducted the section 453.026 pre-placement assessment may conduct the post-placement assessment. Section 453.077.1. "[T]he postplacement assessment shall include an update of the preplacement assessment which was submitted to the court pursuant to section 453.070, and a report on the emotional, physical, and psychological status of the child." Id.
The purpose of the reports mandated by sections 453.070 and 453.077 is to provide the trial court with adequate information to determine whether "the child is suitable for adoption" and whether it is in the best interest of the child to finalize the adoption. In re Adoption of G., 389 S.W.2d 63, 66 (Mo.App.1965). Although these reports do not adjudicate the issues, In re K.K.J., 984 S.W.2d 548, 554 (Mo.App. 1999), the trial court cannot make an informed *813 decision in their absence. Completion and review of these reports post-decree is futile. In re Adoption of G., 389 S.W.2d at 66.
In this case, the trial court was provided with an extensive report prepared about the Adoptive Parents' fitness to be foster parents, not adoptive parents, and a one-paragraph "update to adoptive home study" furnished by the GAL, Mr. Garrity. Neither document complies with either section 453.070 or section 453.077. Neither document examines whether Child was suitable for adoption, including whether circumstances warrant termination of parental rights or adoption without the Mother's consent. Neither document accesses the Adoptive Parents' fitness to be adoptive parents, nor do they evaluate the Adoptive Parents after Child was placed with them.
The trial court did not comply with these mandatory investigations and written reports. The record shows that the trial court was not briefed fully about the best interests of the Child, his suitability for adoption, and the suitability of the Adoptive Parents. The importance of this information is apparent from the legislature's express statement that no adoption decree should be entered without complying with the investigation and reporting requirements. Section 453.070.1. In this case, those reports would have provided information about Mother that was not otherwise before the trial court. It was manifestly unjust for the trial court to enter its judgment without the essential information in these reports.

IV. Remedy
Mother believes that a failure to strictly comply with any of the statutes at issue in her case warrants an outright reversal, dismissal of the adoption petition, and a return of Child to her custody. Generally, "[a]n appellate court should reverse a plaintiff's verdict without remand only if it is persuaded that the plaintiff could not make a submissible case on retrial. The preference is for reversal and remand." Kenney v. Wal-Mart Stores, Inc., 100 S.W.3d 809, 818 (Mo. banc 2003) (internal citations omitted); McClain v. Kelley, 247 S.W.3d 19, 22 (Mo.App.2008). A failure to comply with the statutory mandates of chapter 211 or chapter 453 may require a reversal of the termination of parental rights, but it does not require an outright reversal unless the evidence is insufficient to support the judgment. In re C.W., 211 S.W.3d at 98 (reversing and remanding); In re C.A.L., 228 S.W.3d 77 (Mo.App.2007) (reversing after finding there was insufficient evidence to support the trial court's conclusions that a father neglected his child and failed to rectify the conditions that brought the child under the court's authority); In re R.M., 234 S.W.3d 619, 625 (Mo.App.2007) (reversing termination of parental rights and dismissing adoption petition because of insufficient evidence to establish neglect). When an appellate court remands a case for a new trial, all issues are open to consideration, and pleadings may be amended and new evidence may be produced. Butcher v. Main, 426 S.W.2d 356, 357 (Mo.1968).
In this case, the complete failure to comply with the mandatory provisions of sections 453.070 and 453.077 requires that the judgment be reversed. Whether the cause is remanded depends on whether Adoptive Parents presented sufficient evidence to make a submissible case on their claims that Mother abandoned Child.

V. Sufficient Evidence of Abandonment Under Section 211.447
Mother argues that the evidence adduced at trial was insufficient to prove *814 by clear, cogent, and convincing evidence that she willfully abandoned Child and, therefore, the trial court erred in terminating her parental rights. She contends that if the Adoptive Parents failed to present sufficient evidence to prove by clear, cogent, and convincing evidence that she abandoned Child, the judgment must be reversed outright and custody must be returned to her.
Mother has filed with this Court what she characterizes as an offer of proof, which is evidence outside the record because it was not evidence at trial, to show that she did not abandon Child and that her counsel was ineffective. She asks this Court to review this evidence when considering the sufficiency of Adoptive Parents' evidence. In her argument in support of her claim that the evidence is insufficient, Mother relies on this evidence outside the record to show that there is not clear, cogent, and convincing evidence of abandonment. These materials were not offered at trial, where the issue of abandonment was adjudicated. Therefore, no evidentiary foundation was provided for the proffer, the trial court did not determine the materials' admissibility, the materials were not subject to cross-examination, and the trial court did not determine their credibility or weight. Moreover, none of the materials was made a part of the record on appeal by stipulation of the parties.[15] "Appellate courts are merely courts of review for trial errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court." Robbins v. Robbins, 328 S.W.2d 552, 555 (Mo.1959) (internal citations omitted). See also section 512.160(1); State v. Tokar, 918 S.W.2d 753, 762 (Mo. banc 1996) (denying motion to supplement record on appeal because the information in the supplement was not before the trial court and the opposing party did not have an opportunity to respond to the information). Mother's request is contrary to law, and this Court should not look beyond the record in examining sufficiency of evidence at trial.[16]See State v. Strong, 142 S.W.3d *815 702, 729 (Mo. banc 2004); State v. Sumowski, 794 S.W.2d 643, 646 (Mo. banc 1990).
Mother's claim regarding the admission of hearsay evidence must be addressed before her claims of insufficient evidence are reviewed. She contends that the trial court relied substantially on Ms. Davenport's testimony to support its finding that she abandoned Child. She asserts that Ms. Davenport's testimony is largely inadmissible hearsay that should be stricken from the record. Mother concedes that she did not object to the testimony and requests plain error review. Hearsay admitted without objection may be considered as evidence by the trier of fact. State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002); State v. Goodwin, 43 S.W.3d 805, 818 (Mo. banc 2001); State v. Thomas, 440 S.W.2d 467, 470 (Mo.1969). As Mother did not object to Ms. Davenport's testimony, the trial court did not err in considering Ms. Davenport's hearsay testimony. This Court will review this evidence with all other evidence in the record on appeal when considering Mother's sufficiency of evidence claims.
In terminating parental rights, "the trial court must find by clear, cogent, and convincing evidence that one or more grounds for termination exist under subsections 2, 3, or 4 of section 211.447, and 2) the trial court must find that termination is in the best interests of the [child]." In re P.L.O., 131 S.W.3d 782, 788 (Mo. banc 2004). "The clear, cogent, and convincing standard of proof is met when evidence `instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" In re Adoption of W.B.L., 681 S.W.2d 452, 454 (Mo. banc 1984).
This Court reviews whether clear, cogent, and convincing evidence was presented to support a statutory ground for terminating parental rights under Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976). In re P.L.O., 131 S.W.3d at 788-789. Therefore, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Murphy, 536 S.W.2d at 32. The judgment will be reversed "only if we are left with a firm belief that the order is wrong." In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005).
Conflicting evidence will be reviewed in the light most favorable to the trial court's judgment. Id. at 362. Appellate courts will defer to the trial court's credibility assessments. In re Adoption of W.B.L., 681 S.W.2d at 455. When the evidence poses two reasonable but different inferences, this Court is obligated to defer to the trial court's assessment of the evidence. Washington v. Barnes Hosp., 897 S.W.2d 611, 615 (Mo. banc 1995). "Greater deference is granted to a trial court's determinations in custody and adoption proceedings than in other cases." In re S.L.N., 167 S.W.3d at 741.
After this Court determines that one or more statutory ground has been proven by clear, convincing, and co-gent *816 evidence,[17] this Court must ask whether termination of parental rights was in the best interest of the child. In re P.L.O., 131 S.W.3d at 789. At the trial level, the standard of proof for this best-interest inquiry is a preponderance of the evidence; on appeal, the standard of review is abuse of discretion. Id.
In this case, the trial court terminated Mother's parental rights on the ground of abandonment pursuant to section 211.447.2(2)(b). Section 211.447.2(2)(b) states:
(2) A court of competent jurisdiction has determined the child to be an abandoned infant. For purposes of this subdivision, an "infant" means any child one year of age or under at the time of filing of the petition. The court may find that an infant has been abandoned if:
* * *
(b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so;
(Emphasis in original). Section 211.447.2(2)(b) specifies no particular period that the court must examine to make a finding of abandonment of an infant. Cf. Section 211.447.5(1) (the court must find abandonment for a period of six months or longer if the child is over one year of age at the time of filing the TRP petition).
Abandonment is defined as "a willful delivery of the child with intention that the severance be permanent [or] a voluntary and intentional relinquishment of the custody of the child to another with the intent to never again claim the rights of parent or perform the duties of a parent." In re Adoption of H.M.C., 11 S.W.3d 81, 87 (Mo.App.2000). "Abandonment can be proven by showing that, without just cause or excuse, a parent has intentionally withheld his presence, care, love, protection, maintenance and the opportunity for display of filial affection from the child." In re E.F.B.D., 245 S.W.3d 316, 327 (Mo.App.2008). Abandonment is largely a matter of intent. In re Adoption of W.B.L., 681 S.W.2d at 455.
In this case, Mother was incarcerated. Incarceration alone does not constitute abandonment. In re D.S.G., 947 S.W.2d 516, 519 (Mo.App.1997). While the trial court may consider incarceration, there must be additional evidence that the parent intentionally withheld his or her presence, care, love, protection, maintenance and the opportunity for display of filial affection from the child. For example, if the incarcerated parent fails to maintain a continuing relationship with the child, abandonment can be found. Id. Normally, "a finding of abandonment is not compatible with a finding that custody has ended involuntarily." In re N.R.W., 112 S.W.3d 465, 469 (Mo.App.2003). However, the court may still find abandonment when "a parent's lack of involvement goes beyond what is attributable to the estrangement and discouragement caused by the enforced separation." Id. at 469-70. If a temporary placement of the child is made, the parent must continue to show "parental interest and concern" for the child. In re C.M.D., 18 S.W.3d 556, 562 (Mo.App.2000).
Mother's arrest caused an involuntary end to her custody of Child. After her arrest and incarceration, the evidence at trial showed no involvement by Mother in *817 Child's life. Ms. Davenport testified that Mother's sister cared for Child without assistance for only a short period. Mother's sister sought Ms. Davenport's help to resolve her inability to care for Child when Child was younger than 9 months old. Because of that need, Ms. Davenport and then the Velascos were involved in Child's life. Mother's sister asked the Velascos to care for Child because she and her husband were not able to do so. When Child went to live with Adoptive Parents, they told the Velascos to give their name and address to anyone who asked questions about Child or "came looking" for him. The Adoptive Parents did not "hide" Child. From October 3, 2007, when they took custody to the date of trial, the Adoptive Parents have provided all care for Child. No one, including Mother or her family, has contacted them to inquire about Child or offered assistance with Child, even though Mother had their name and address from the time she was served with the petition on October 16, 2007. M.M. speaks and reads Spanish, and there were no letters that the Adoptive Parents received in Spanish about Child. There were no inquires by Mother about Child's welfare, no expressions of interest in Child, or any effort to have any involvement in Child's life. Adoptive Parents' attorney sent two letters to Mother when she was incarcerated in the St. Clair County jail. One letter was returned because delivery was refused.
The evidence before the trial court was that, although Mother's custody of Child ended involuntarily, thereafter she took no action to show parental interest and concern until after the petition was served. On October 28, 2007, she wrote a letter to Mr. Hensley, Adoptive Parents' attorney, in English and Spanish requesting that her Child not be adopted, that her Child be placed in foster care, and that she receive visitation with the Child while she was incarcerated. A request for visitation while incarcerated can show an intent to maintain contact with a child. In re M.L.K., 804 S.W.2d 398, 402 (Mo.App. 1991). However, one post-petition gesture does not outweigh the substantial evidence of abandonment on the record. See In re J.B.D., 151 S.W.3d 885, 889 (Mo.App.2004) (finding abandonment even though the incarcerated father sent letters, cards, and tapes of himself reading books to his children only after the termination petition had been filed). Her lack of action to maintain contact with the persons she thought were caregivers of Child to assure that he was in a safe environment and receiving adequate care and her failure to take action to maintain a relationship with him shows a lack of maternal affection for and involvement with her Child. While Mother was incarcerated and does not speak English, she told Ms. Davenport that there was someone who could read English in her cell or area. She also could have taken action to make contact with Child, her sister, or her brother in Spanish. Her expression of surprise about her child's whereabouts on September 9, 2007, shows that she had not been in contact with her brother or sister about Child.[18]
The evidence also showed that Mother did not seek Ms. Davenport's assistance, who is fluent in Spanish, to deliver a note or any type of communication to her sister, brother, or Child. The record further shows her ability to communicate by letter, in that she communicated with Mr. Hensley.[19] *818 In that communication and in her conversation with Ms. Davenport, she stated that she did not want Child adopted. These two expressions of desire that Child not be adopted are not sufficient to show maternal concern or an effort to care for Child and could be construed by the trial court as token gestures. Section 211.447.8; In re C.M.D., 18 S.W.3d at 562.
There is a reasonable inference from the evidence at trial that Mother did not place Child with her brother at the time she was arrested and, instead, Child was at his home when she was arrested only because that is where he lived with Mother. This Court recognizes that when difficulties arise within the nuclear family, children often are raised with assistance from other family members. In re A.S.W., 137 S.W.3d 448, 453 (Mo. banc 2004). The record at trial supports a finding that Mother's difficulties and reliance on her family to aid in Child's care did not excuse Mother from not trying to contact him in any manner and maintain some type of relationship with him. As such, the record contains clear, cogent, and convincing evidence of abandonment under section 211.447.

VI. Adoption without Consent Pursuant to Section 453.040(7)
Mother also challenges the trial court's finding that her consent was not necessary to proceed with the adoption of Child under section 453.040(7). Section 453.040 states:
The consent to the adoption of a child is not required of:
* * *
(7) A parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection[.]
In the Adoptive Parents' petition, they alleged that Mother's consent was not necessary because she abandoned and neglected Child. The petition alleged that "[p]ursuant to § 453.040(7) RSMo [2000], the consent of the biological parents is not necessary because the biological mother and father of the child have for a period of at least sixty days immediately prior to the filing of the Petition for Adoption, willfully abandoned child and have willfully, substantially and continuously neglected to provide the child with necessary care and protection." The trial court expressly found that "[p]ursuant to § 453.040(7) R.S.M.o., the consent of the biological parents is not necessary because the biological mother ... [has] for a period of at least sixty days immediately prior to the filing of the Petition for Adoption, willfully abandoned the child and have willfully, substantially and continuously neglected to provide the child with necessary care and protection."[20] Accordingly, the trial *819 court's judgment contains express and consistent findings of abandonment.
Consent of the natural parents or involuntary termination of parental rights is a prerequisite to adoption under chapter 453. In re J.F.K., 853 S.W.2d at 934. The clear, cogent, and convincing standard of proof applies in chapter 453 termination cases and adoptions. In re Adoption of W.B.L., 681 S.W.2d at 454. Also, under chapter 453 adoptions, "the court may hear and determine the issues raised in a petition for adoption containing a prayer for termination of parental rights filed with the same effect as a petition permitted pursuant to subsection 2, 4, or 5 of [section 211.447]." Section 211.447.9.
The adoption petition was filed October 5, 2007.[21] As such, the relevant 60-day period began August 5, 2007. To determine abandonment, a court examines a parent's intent by considering all the evidence of the parent's conduct "including that before and after the statutory period." In re Adoption of W.B.L., 681 S.W.2d at 455. "The greatest weight is given to conduct within the statutory period, and the least weight is given to conduct after the petition for adoption is filed." In re I.D., 12 S.W.3d 375, 377 (Mo.App.2000).
As stated above, the record shows that after Mother's arrest, she made no effort to make accommodations for Child's care and custody. Although immediately following Mother's arrest it may have been difficult for her to contact her brother or sister for updates about the Child's well-being, the evidence at trial, as discussed above, shows that Mother made no effort from August 5, 2007, to October 5, 2007, to contact her family or friends. The record contains clear, cogent, and convincing evidence that Mother abandoned Child. Because the petition contains this claim and there is sufficient evidence to support the claim, a remand is the required remedy. The issue of abandonment may be adjudicated on remand.
Because the judgment is reversed for failure to comply with statutes mandating investigation and reporting, the entire judgment is reversed as to all findings pertaining to Mother, which includes the trial court's finding of abandonment under section 453.040(7). Butcher, 426 S.W.2d at 357. The cause is ordered remanded for a new trial on all issues pertaining to Mother contained within the petition. On remand, the investigations and reports required pursuant to sections 453.070 and 453.077 must be made prior to such trial.

VII. Ineffective Assistance of Counsel Claim
Mother also alleges her due process rights were violated because the attorneys *820 appointed to represent her were ineffective. In support of her claim, she asserts that the record shows that her first appointed attorney, Mr. Calton, did nothing on her behalf during the six months he represented her. She also claims that her second attorney, Mr. Dominguez, did not make contact with her for six weeks after he was appointed, did not move to continue the trial setting or otherwise attempt to secure additional time to prepare adequately, did not serve any discovery or depose anyone, and did not make arrangements for her to participate at the trial or present her testimony in another form. She has proffered in this Court evidence that she asserts her attorneys should have discovered through investigation or communication with her.[22] She further asserts that she was prejudiced by her counsel's failure to present this evidence at the trial on the petition. She also claims that Mr. Dominguez had a conflict of interest because he was hired and was to be paid by the Adoptive Parents.
Because the Court is reversing and remanding for a new trial on all issues within the adoption petition, this claim of error, as well as her other due process claims, are moot. Mother will be represented in the trial court by the attorneys that she has obtained, who have represented her competently in this Court. During the proceedings in the circuit court after remand, she will have the opportunity to present the evidence she believes is relevant to her defense, which may include the information in her appendix, if admissible. The Adoptive Parents will have the opportunity to again present the evidence they adduced at the first trial, as well as any additional evidence they believe is relevant to the issues contained within the adoption petition.

VIII. Issues that May Arise on Remand

A. GAL's and Juvenile Officer's Failure to Investigate and Discharge Duties
Mother also claims she was denied due process by the GAL's and the juvenile *821 officer's failure to investigate her and to act independently of the Adoptive Parents. Like her claim of ineffective assistance of counsel, this claim is mooted by the reversal of the judgment against her on other grounds. Because the GAL and juvenile officer will be required to participate in the proceedings on remand, their roles merit discussion.
Section 211.462.3 states that a "guardian ad litem shall, during all stages of the proceedings: (1) Be the legal representative of the child ... (2) Be an advocate for the child ... (3) Protect the rights of a minor or incompetent parent." Because Mother is not a minor nor was she adjudicated as incompetent, she did not require the appointment of GAL under section 211.462.2. Mr. Garrity was appointed to represent Child. A GAL is not appointed to advocate for the natural parent; therefore, Mother cannot be denied due process on the ground that her Child's attorney failed to represent her interests. Nevertheless, it is in the best interests of the child for a GAL to discharge his or her duties diligently and to be an advocate during the TPR and adoption proceedings. In re J.L.H., 647 S.W.2d 852, 861 (Mo.App. 1983) ("The role of guardian ad litem involves more than perfunctory and shadowy duties.... The guardian ad litem is supposed to collect testimony, summon witnesses and jealously guard the rights of infants, which is the standard duty in this state.")
In addition, if Adoptive Parents continue to rely on chapter 211 as is pleaded in their petition, section 211.447.2(2)(b) requires the juvenile officer to be joined as a party to any proceeding when the petition to terminate parental rights is filed by someone other than the juvenile officer.[23] The juvenile officer was represented by Ms. Elliston, who was present at the trial. Although present, Ms. Elliston did not actively participate in the proceedings. On remand, the juvenile officer is required by section 211.447.2(2)(b) to seek joinder as a party so long as chapter 211 is pleaded in the petition. Just as it is in the child's best interest for the GAL to discharge his or her duties diligently, it also is in the child's best interest for the juvenile officer to participate actively in chapter 211 proceedings.

B. Propriety of Combining Termination Proceeding and Adoption Proceedings
Mother asserts that combining the TPR hearing and the adoption hearing into the same proceeding improperly injected evidence relevant to the adoption into the TPR hearing. TPR hearings under chapter 211 and adoption hearings under chapter 453 can proceed simultaneously before the same judge. See State ex rel. Womack v. Rolf, 173 S.W.3d 634, 639 (Mo. banc 2005); see also Blackburn v. Mackey, *822 131 S.W.3d 392, 396-98 (Mo.App.2004). The quality of the adoptive home is not a part of the termination inquiry; rather, the focus is on the natural parent's interactions and relationship with the child. See section 211.447; section 453.040(7). The issue of termination must be considered first in contested chapter 453 adoptions to avoid confusing the quality of the adoptive home with the grounds for terminating parental rights. In re M.O., 70 S.W.3d 579, 588 (Mo.App.2002).
The trial court is presumed to know the law. Lane v. Lensmeyer, 158 S.W.3d 218, 224 (Mo. banc 2005). Moreover, "[t]he presumption is that the court, in weighing the evidence, was governed by correct rules of law." Linders v. Linders, 356 Mo. 852, 204 S.W.2d 229, 234 (1947); see also Hodel v. Dir. of Revenue, 61 S.W.3d 274, 280 (Mo.App.2001) (stating that appellate courts "presume the trial court will sort out the incompetent and irrelevant and base its decision upon the competent and relevant evidence."). In this case, this Court presumes that the trial court considered and applied the evidence appropriately in first adjudicating termination of parental rights and then the adoption and will do so again on remand.

IX. Adoptive Parents' Motions

A. Motion to Strike Mother's Statement of Facts
The Adoptive Parents move to strike Mother's statement of facts in her appellant brief. They allege that the statement of facts is argumentative and casts the evidence in the light most favorable to appeal as opposed to the judgment. They also assert that the statement references evidence outside the record on appeal. They request that this Court strike the brief in its entirety and dismiss the appeal or, in the alternative, strike the statement of facts and require that Mother to resubmit her brief so that it comports with Rule 84.04(c).
Rule 84.04(c) requires that the statement of facts be fair and concise, relevant to the questions presented, and without argument. Mother's appellate brief does not comply with Rule 84.04(c). Her statement of facts is long and argumentative. Nevertheless, her brief is not so deficient to require this Court to become an advocate for Mother, which is generally the basis for an appellate court's dismissal of an appeal. Brown v. Hamid, 856 S.W.2d 51, 53 (Mo. banc 1993). "Cases should be heard on the merits if possible, construing the court rules liberally to allow an appeal to proceed.... While not condoning noncompliance with the rules, a court will generally, as a matter of discretion, review on the merits where disposition is not hampered by the rule violations." Id. The motion to strike Mother's brief or, in the alternative, her statement of facts, is overruled.

B. Motion to Strike Mother's Appendix
The Adoptive Parents move to strike Mother's appendix because it does not comport with Rule 84.04(h) in that it contains evidence outside the record on appeal. The relevant portions of Rule 84.04(h) state:
A party's brief shall contain or be accompanied by an appendix containing the following materials, unless the material has been included in a previously filed appendix:
(1) The judgment, order, or decision in question, including the relevant findings of fact and conclusions of law filed in a judge-tried case or by an administrative agency;
(2) The complete text of all statutes, ordinances, rules of court, or agency *823 rules claimed to be controlling as to a point on appeal; and
(3) The complete text of any instruction to which a point relied on relates.
An appendix also may set forth matters pertinent to the issues discussed in the brief such as copies of exhibits, excerpts from the written record, and copies of new cases or other pertinent authorities.
Rule 84.04(h) does not authorize inclusion of evidence outside the record on appeal. "The mere inclusion of documents in an appendix to a brief does not make them part of the record on appeal." Washington v. Zinn, 286 S.W.3d 828, 831 (Mo.App.2009). As discussed above, this Court will not consider documents and testimony outside the record on appeal.[24]Strong, 142 S.W.3d at 728-29; see also Sumowski, 794 S.W.2d at 646; see also Washington, 286 S.W.3d at 831.
Mother's appendix contains approximately 100 pages of statutes, regulations, and the judgment that all may be included under Rule 84.04(h). She added an additional 200 pages of evidence not contained in the record on appeal, largely to support her claim of ineffective assistance of counsel. She asserts that she should be able to raise her claim of ineffectiveness of counsel in the termination of parental rights on appeal and that it is essential that she be able to file evidence to support such a claim. The reversal of the judgment against Mother on grounds rendering her claim of ineffective assistance of counsel moot makes it unnecessary to establish a mechanism for hearing evidence regarding her ineffective assistance of counsel claim. Because the proffered evidence is outside the record and may not be considered properly on the other issues she raises on appeal, the evidence will not be considered.

C. Motion to Dismiss Appeal for Failure to Timely File Notice of Appeal
The Adoptive Parents move to dismiss Mother's appeal for failure to file a timely notice of appeal. This Court, in its discretion, rendered a decision on the merits of this issue in State ex rel. E.M.B.R v. Missouri Court of Appeals, Southern District, SC90226, (Order issued July 23, 2009) and allowed Mother to file her appeal out of time. This Court's ruling on this issue is the law of the case. The law of the case doctrine states that a previous holding in a case is "the law of the case" and bars relitigation of issues "not only expressly raised and decided on appeal, but also those that could have been raised but were not." Walton v. City of Berkeley, 223 S.W.3d 126, 129 (Mo. banc 2007). The doctrine governs successive adjudications involving the same issues and facts. Shahan v. Shahan, 988 S.W.2d 529, 533 (Mo. banc 1999). The motion to dismiss the appeal is overruled.

X. Conclusion
The trial court plainly erred by entering judgment on the adoption petition and terminating Mother's parental rights without complying with the investigation and reporting requirements of sections 211.455, 453.070, and 453.077. The trial court's judgment terminating Mother's parental rights, allowing the adoption to proceed without Mother's consent to the adoption, and granting of the adoption, although supported by clear, cogent, and convincing evidence on the record, is reversed. The cause is remanded for a new trial in which Adoptive Parents and Mother will have the opportunity to present evidence on all claims in all counts of the petition that *824 pertain to Mother. On remand, the trial court shall compel expeditious compliance with the investigation and reporting requirements of sections 211.455, 453.070, and 453.077. The trial court further is ordered to set the trial date no more than 90 days after the reports have been received.
In respect to the termination of putative father's parental rights, the judgment is affirmed.[25]
PRICE, C.J., RUSSELL and FISCHER, JJ., concur.
STITH, J., concurs in part and dissents in part in separate opinion filed.
TEITELMAN and WOLFF, JJ., concur in opinion of STITH, J.
WOLFF, J., concurs in part and dissents in part in separate opinion filed.
TEITELMAN and STITH, JJ., concur in opinion of WOLFF, J.
LAURA DENVIR STITH, Judge, concurring in part and dissenting in part.
The power to terminate parental rights is a responsibility of the judiciary that, when exercised erroneously, can inflict grievous and irretrievable loss. It is for this reason that parental rights will not be terminated absent strict adherence to the law and clear, cogent and convincing evidence that termination is warranted. This case represents a wholesale failure at the trial level to abide by these basic, fundamental limitations on the state's power to impose what is, in essence, a family's civil death penalty.
I concur in the principal opinion to the extent it holds that an entirely new termination and adoption hearing is required due to the plain error in failing to comply with the mandatory legislative requirements of: (1) an independent investigation and written report pursuant to section 211.455, RSMo 2000, after filing a petition for termination of parental rights under chapter 211 to help the court determine if termination is in the best interest of the child; and (2) the investigations and written post-placement assessments of the child and the adoptive parents required by sections 453.070, RSMo Supp.2010, and 453.077, RSMo 2000. I also concur that (3) the juvenile officer was required to be joined as a party, not just to attend the termination proceeding as a spectator, and must take an active role at any new hearing under section 211.447.2(2)(b), RSMo Supp.2010. I would add that any new hearing must occur only upon proper notice and with appointment of unconflicted and competent counsel, neither of which *825 were present at the circuit court hearings to date in this matter.
When these vital safeguards are ignored, a manifest injustice can result when those rights and interests are lost to an inadequate or one-sided presentation of the facts and law. That is what occurred below. The principal opinion demonstrates appropriate concern for these failures, and I agree with it insofar as it requires an entirely new termination and adoption hearing for which constitutional notice is provided and adequate protection of the rights of parent and child are observed.
I nonetheless dissent in part because I believe the principal opinion's methodical approach to categorizing which rules were followed and which were broken loses sight of what it acknowledges is the fundamental duty of the courtsto protect the constitutional rights of parent and child and to protect the birth-family relationship. Section 211.443 states:
The provisions of sections 211.442 to 211.487 shall be construed so as to promote the best interests and welfare of the child as determined by the juvenile court in consideration of the following:
(1) The recognition and protection of the constitutional rights of all parties in the proceedings;
(2) The recognition and protection of the birth family relationship when possible and appropriate; and
(3) The entitlement of every child to a permanent and stable home.
§ 211.443, RSMo 2000. These legislative requirementsof independent investigations and reports, appointment of counsel and proper noticelike the constitutional provisions underlying them, are intended to ensure that the fundamental rights of birth parents and the best interests of the child are honored in fact, not just in theory. As discussed below, these legislative directives were not met, the mother's rights were not recognized, the birth-family relationship was not protected, and the long delay only has contributed to the lack of a permanent and stable home for the child.
While I respect the principal opinion's determination that a new hearing is needed, I would reverse the termination of the mother's parental rights and approval of adoption by the adoptive parents without the requirement of a new hearingdue to the failure to show clear, cogent and convincing evidence of abandonment, due to the manifest injustice resulting from the failure to give the mother notice and due to the inherent conflict of the mother being represented by counsel hand-picked by the adoptive parents.[1] I would remand only so that the circuit court can arrange for a suitable transition process to ease the restoration of the child to his mother's custody.
In so stating, I am deeply aware of the love and affection that has grown between the adoptive parents and the child during the far-too-lengthy process that has gone on here and that an adverse outcome would be a tragedy to them, just as it is a tragedy to the mother should her son remain with the adoptive parents. This is not their failure but rather the failure of the system to adjudicate these issues adequately, fairly and timely. But I reject the adoptive parents' argument that this failure itself provides additional fodder for separating the mother from her son.[2] *826 This would serve only to encourage delay in future cases as a means of obtaining relief that otherwise would not be merited.

I. ADOPTIVE PARENTS FAILED TO SHOW ABANDONMENT BY CLEAR, COGENT AND CONVINCING EVIDENCE

A. Fundamental Rights of Parents and Standard of Appellate Review
The interest of parents in the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Therefore, "[t]he fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." In the Interest of K.A.W., 133 S.W.3d 1, 12 (Mo. banc 2004). Instead, because "parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), due process demands that a judgment terminating parental rights be supported by clear, cogent and convincing evidence. Id. at 769, 102 S.Ct. 1388.
In reviewing the circuit court's judgment that termination of a parent's rights was supported by clear, cogent and convincing evidence, this Court applies the standard of review set forth in Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976): a judgment will be sustained "unless there is no substantial evidence to support it, it is against the weight of the evidence or the trial court erroneously declares or applies the law." In re Adoption of W.B.L., 681 S.W.2d 452, 454 (Mo. banc 1984). As W.B.L. notes, Murphy v. Carron:
is not inconsistent with the high `clear, cogent and convincing' standard of proof which Missouri law requires to be satisfied by the trial court as fact finder in termination cases. That same standard of proof applies both to termination cases initiated by the state, § 211.447.2(2), RSMo Cum.Supp.1984; see Santosky v. Kramer, 455 U.S. 745, 749, n. 3 [102 S.Ct. 1388] ..., and in conjunction with adoption under Chapter 453.
Id. at 454 (emphasis in original). As W.B.L. further explained in regard to both chapter 211 and chapter 453 proceedings to terminate parental rights, while the existence of contrary evidence does not necessarily mean that the clear, cogent and convincing evidence standard was not met, that standard of proof requires that:
the evidence "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." In re O'Brien, 600 S.W.2d 695, 697 (Mo. App.1980).
Id. This high standard for showing clear, cogent and convincing evidence is not unique to termination of parental rights cases. This is the standard applied on review of any judge-tried case in which the applicable standard of proof is clear, cogent and convincing evidence, whether the case involves a termination of parental rights[3] or some other kind of proceeding. See, e.g., Mace v. Loetel, 166 S.W.3d 114, *827 117 (Mo.App.2005) ("The standard of proof in a discovery of assets proceeding is that of `clear, convincing, and cogent evidence'... As a result, in order for the trial court's judgment to be supported by substantial evidence, the evidence must also be clear, cogent, and convincing").
Indeed, as noted by In re Estate of Dawes, 891 S.W.2d 510, 522 (Mo.App. 1994), in construing a constructive trust, "[t]he requirement of an extraordinary measure of [clear, cogent and convincing] proof is not inconsistent with our standard of review, which is governed by ... Murphy v. Carron.... `Substantial evidence' and `the weight of the evidence,' as those terms are used in Murphy v. Carron, ... must satisfy the applicable standard of proof."
In other words, what evidence is sufficient to meet the "substantial evidence" and "weight of the evidence" standard set out in Murphy v. Carron will vary depending on whether the trial court had to find the proposition was proved by a preponderance of the evidence or by clear, cogent and convincing evidence. Or, as the court of appeals stated in requiring proof of mental illness by clear, cogent and convincing evidence in an involuntary commitment proceeding:
Substantial evidence as used in Murphy means clear, cogent and convincing when that standard of proof is applicable. Thus, if it cannot be said that the judgment in this case is supported by clear, cogent and convincing evidence, then it cannot be said the judgment is supported by substantial evidence, and under Murphy v. Carron, must be reversed.
In re O'Brien, 600 S.W.2d 695, 698 (Mo. App.1980) (emphasis added). O'Brien concluded that, in the case before it, "Because this court cannot find clear, cogent and convincing evidence that [O'Brien] presented a likelihood of serious physical harm to others, [his commitment] is not supported by substantial evidence." Id.
It is plain then that the standard for reviewing the termination of the mother's parental rights below must be informed by the clear, cogent and convincing standard of proof. To affirm based on evidence that, at most, may be sufficient to meet a preponderance of the evidence standard would defy the legislative requirement that the fundamental rights of a parent and child not be rent apart except on clear, cogent and convincing evidence. It would render the applicable standard of review, as set forth in Murphy v. Carron, devoid of any meaningful content.
As applicable here, that means that, although the evidence adduced below is viewed in the light most favorable to the judgment, In the Interest of C.W., 211 S.W.3d 93, 99 (Mo. banc 2007), the appellate court must not cast a blind eye to overwhelming evidence undermining the judgment. To the contrary, "when reviewing a trial court's termination of parental rights, appellate courts must examine the trial court's findings of fact and conclusions of law closely." In re K.A.W., 133 S.W.3d 1, 12 (Mo. banc 2004).
The judgment in this case is not based on clear, cogent and convincing evidence. The principal opinion has not considered the contrary evidence in the record itself, including a letter from the mother to the court and information provided by a neighbor of the mother in determining whether there is clear, cogent and convincing evidence or whether there was a manifest injustice. The principal opinion has not even set out this evidence except briefly to discredit it (not entirely correctly) as being of little relevance because it was filed after the petition. Neither has it given any weight to the fact that the findings of abandonment are based almost entirely on *828 hearsay evidence. While, as the principal opinion notes, hearsay evidence may be considered when not objected to, its hearsay nature and lack of specificity still detract from the weight of that evidence.[4] The court below and the principal opinion erred in failing to consider the record evidence, sent to the court's attention by the mother herself, evidencing her lack of abandonment, lack of notice, desire for visitation and contact with her son, and the falseness of the testimony to the contrary of Ms. Davenport from Parents as Teachers.

B. The Record does Not Contain Clear, Cogent and Convincing Evidence of Abandonment
The circuit court determined that the mother's consent to adoption was not required because it found she had abandoned her son under section 453.040.7, RSMo 2000, which states that the consent to adoption of a parent is not necessary in the case of a "parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child. ..." (emphasis added). The petition for adoption in this case was filed two weeks before the child turned one year old. Therefore, the adoptive parents had to show, by clear, cogent and convincing evidence, that the mother continuously and willfully abandoned her son for a period of 60 days prior to filing the petition. See In re Adoption of N.L.B. v. Lentz, 212 S.W.3d 123, 129 (Mo. banc 2007) ("The statutory requirement to prove abandonment `for a period of at least sixty days,' implies abandonment for a continuous period of 60 days...").
"Willful abandonment" has been defined as "the voluntary and intentional relinquishment of custody of the child with the intent to never again claim the rights or duties of a parent, or, the intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse." I.D. v. B.C.D., 12 S.W.3d 375, 378 (Mo.App.2000).
There is no dispute that the mother did not relinquish custody of her son voluntarily. Instead, the dispute centers on whether the mother intentionally withheld her love, care, protection and presence without just cause or excuse. Therefore, the applicable abandonment analysis focuses on determining the mother's intent, as inferred from her conduct. In re N.R.W., 112 S.W.3d 465, 469 (Mo.App.2003). In addition to the mother's conduct during the 60 days immediately preceding the filing of the adoption petition, her conduct both before and after the statutory period for abandonment is relevant to the analysis. In re P.G.M., 149 S.W.3d 507, 514 (Mo. App.2004).
The adoptive parents filed their petition October 5, 2007. Therefore, pursuant to section 453.040.7, they had to prove that the mother continuously and willfully abandoned her son beginning no later than August 6, 2007. The ineffectiveness of the mother's counsel left a sparse record regarding her efforts to arrange care for and maintain contact with her son during her absence. The record consists almost entirely of evidence introduced by the adoptive parents.
*829 The evidence introduced by the adoptive parents and relied on by the circuit court when it adopted the adoptive parents' proposed findings without modification shows that when the mother was arrested May 22, 2007, her son was staying with her brother and his family. This arrangement continued for a few days until the brother sent the child to stay with the mother's sister. The sister worked outside of the home and, like many people, needed to arrange for outside child care services. Laura Davenport, a parent educator with Parents as Teachers, referred the sister to the Velasco family.
For several weeks, the Velascos took the child in the morning, and the sister would bring him back home in the evening. The sister and the Velascos then agreed that the child would stay with the Velascos during the week and that the sister would care for him on the weekends. As of mid-September 2007, well after the child was alleged to have been abandoned, the child still was living with the sister on the weekends.[5]
The record in this case is wholly insufficient to support a finding of willful abandonment under section 453.040.7. To the contrary, at all timesbefore and after the alleged statutory period of abandonment there are simply no facts that yield clear, cogent and convincing evidence supporting the circuit court's finding of abandonment.

1. Mother's conduct prior to October 5, 2007
The fundamental legal prerequisite underlying the judgment was the finding that the mother willfully and continuously abandoned her son for 60 days prior to October 5, 2007. The circuit court found that when the mother was incarcerated, she made no provision for her son and simply "assumed" that her brother would care for him. This finding, however, is not supported directly by the facts in the record or any reasonable inference from them.
Even though the record consists almost exclusively of evidence introduced by the adoptive parents, there is no evidence that the mother had an opportunity to call her family to make arrangements for her son upon her arrest or that she had a better alternative than to leave him with her brother. Instead, the primary evidence presented with respect to the mother's understanding of the situation during the spring and summer of 2007 was Ms. Davenport's hearsay testimony relaying the mother's September 2007 statement that she was "surprised" her son was not still in her brother's care. This statement shows the mother had arranged for her family to care for her son. These facts refute the trial court's finding that the mother operated solely on an assumption and had made no arrangements for her son's care.
Rather than relying on direct evidence in the record, the circuit court's finding as to this point infers abandonment from the fact that the child was being cared for by the brother. This inference is problematic because it implies that the mother instead should have entrusted her son to a non-family member. Even if the mother had the opportunity to make arrangements but did not, it would not be unreasonable for her to assume that her family would continue to care for her son. It is common knowledge that, in difficult situations, children often are raised with extensive help from grandparents, siblings and other family *830 members. In re A.S.W., 137 S.W.3d 448, 453 (Mo. banc 2004). Accordingly, the more reasonable inference to draw from the mother's supposed assumption is that she made the perfectly reasonable decision that the best place for her son was to continue staying with close family members rather than be placed with strangers in a foreign country. Therefore, even had the mother simply "assumed" her family would care for her son, it does not follow that her assumption is evidence of abandonment.
The circuit court also found that the mother made no attempt to contact her son "all the way back to May 22, 2007, a period of over four months and over double the time necessary to establish abandonment." Once again, it must be noted that there is no evidence that the mother had the opportunity to contact her family to inquire about her son. This is not a trivial concern, for the fact is that the mother was incarcerated in a foreign country and immersed in a language she did not speak. If the mother had no reasonable opportunity to get into contact with her family, she cannot be faulted for failing to do so. Under the circumstances of this case, any lack of evidence demonstrating the mother's efforts to contact her son does not prove that she in fact did not undertake such efforts. It is simply a gap in the record that reflects nothing more than the fact that the adoptive parents introduced no evidence tending to disprove the allegations in their own petition.
In fact, however, there was record evidence before the circuit court showing the mother did attempt to communicate with her son as soon as she was told that he was no longer with family and that an attempt was being made to adopt him. Specifically, in her October 28, 2007 letter, the mother informed the adoptive parents' attorney that she did not want her son adopted and that she wanted visitation with her son while in prison.
The circuit court transcript references only the mother's desire that her son not be adopted and makes no mention even of the English translation of her letter, which says, "I would like to have visitation with my son." Even this is not a complete translation, however. The Spanish portion states, "quiero que me veuga a visitor todo el tiempo que este aqui en la carcel." This is not simply a request by mother for visitation, but also a request to visit with her son "all the time that I am here in jail" ("todo el tiempo que este aqui en la carcel"). This is a request to communicate with her son. No attempt was made by the court or any party to provide an official translation, nor was an attempt made to give her any access to her son; to the contrary, even the circuit court's judgment a year later simply ignores her request for visitation and makes a finding of lack of attempt to communicate that clearly is refuted by the attempt that is in the court's own record.
Finally, the circuit court also found that the Velascos began caring for the child "only a few days after" his mother was arrested. This finding is crucial because the cases hold that a transfer of custody for any reason may ripen into abandonment if the absent parent foregoes the performance of the functions of a parent that demonstrate the continued intent to exercise the rights and duties of a parent. In re Adoption of Baby Boy W., 701 S.W.2d 534, 543 (Mo.App.1985). Consequently, the court's conclusion that the Velascos assumed care of the child shortly after his mother's arrest is the basis of the inference that the mother abandoned her son by making no effort to arrange for his care, thereby forcing her family to give the child to the Velascos.[6]
*831 The record, however, does not support the finding that the Velascos began caring for the child "only a few days after" the mother was arrested. Neither the Velascos nor anyone from the mother's family testified. The only evidence supporting this finding was the adoptive mother's testimony that the sister turned the child over to the Velascos within days of the mother's arrest. However, the adoptive mother made it clear that she first met the child September 24, 2007, fewer than two weeks before the petition for adoption was filed. Therefore, the adoptive mother's testimony that the sister placed the child with the Velascos within days of his mother's arrest five months earlier is simply the repetition of hearsay.
Equally importantly, the adoptive mother's hearsay testimony flatly is contradicted by Ms. Davenport's testimony. Ms. Davenport had personal knowledge of where the child was living from the time of his mother's arrest in May 2007 until sometime in July 2007. Ms. Davenport saw the child while he was under the sister's care and recommended that the sister rely on the Velascos for child-care assistance. Ms. Davenport testified that the child lived with the sister and that the Velascos simply provided normal workday child care until at least mid-September 2007. This evidence contradicts the circuit court's finding that the child was living with the Velascos just days after his mother's arrest in May 2007. Conversely, the overwhelming weight of the evidence in this case indicates that the child still was living with the sister at least until sometime in September 2007, just days before the adoptive parents filed their petition.
The conclusion that the child was under the sister's care until at least September 2007 is confirmed by other evidence that was before the circuit court but not mentioned in the findings of fact drafted by the adoptive parents and adopted by the circuit court or in the principal opinion of this Court. For instance, the record reflects that a neighbor, Mr. Walter, went to see the mother while she was in jail. Mr. Walter filed documents with the court November 9, 2007, nearly 11 months before the termination and adoption hearing.
In those documents, Mr. Walter explained that the sister had asked him to help them obtain a passport for the child so they could send him to live with another sister in Guatemala. The record shows that Mr. Walter filed for that passport September 27, 2007, a week before the adoption petition was filed and well within the alleged 60-day period of abandonment. The record further showed that when the sister went to pick up the child from the Velascos on October 3, the first night that he stayed with the adoptive parents, the Velascos simply told her "they didn't have the baby."
This evidence is entirely consistent with the mother's assertion that she wished to take her son home with her after her release and further undermines the court's conclusion that the mother had abandoned her son.
The principal opinion supports ignoring this evidence by stating: "The trial court `is not required to leaf through a file to determine what should be used as evidence.'.... Because this document was not in evidence, it will not be considered." Principal Op. at 814 n.16 (citation omitted). This is not a contract or tort case, however. This is a case in which a child and parent's fundamental right to be a family is at issue. Under our statutes, the birth family is required to be kept together whenever possible and the constitutional *832 rights of the child and parent are to be respected. Indeed:
The United States Supreme Court has recognized that a "natural parent's `desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.'" Santosky v. Kramer, 455 U.S. 745, 758-759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). It is an interest that `undeniably warrants deference and, absent a powerful countervailing interest, protection.' Lassiter v. Department of Social Servs. of Durham Cty., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).
Cannon v. Cannon, 280 S.W.3d 79, 86 (Mo.2009). See also Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" (citation omitted)).
The evidence that this Court says the circuit court acted properly in refusing to consider was the mother's heartfelt plea for visitation with her child and her refusal to consent to his adoption. The record also contains evidence that she did contact her family about her son after her arrest and that she was arranging for him to go home to Guatemala so that he could be cared for there, even arranging for a passport application for him, before the adoption petition was filed.
While the principal opinion acknowledges the passport application, it fails to acknowledge how the information about the application came to the circuit court's notice. It also credits inferences drawn by the adoptive parents' counsel in his proposed findings that the mother did not even know where her child was (based on a single statement that she was surprised her brother did not want to care for her son). Yet the opinion ignores contrary evidence that the mother's family did not abandon the child to the Velascos but rather the Velascos, without notice to the child's birth family, placed him with the adoptive parents, and then simply left a note telling the sister of this fact and washing their hands of the matter.
While a court may not always have a duty to look at the record for evidence not brought to its attention by counsel, simply to ignore that evidence is inconsistent with this Court's duty to look closely at the findings of fact and consider whether the finding of clear, cogent and convincing evidence of abandonment is against the weight of the evidence. The lack of a showing that the circuit court independently considered the proposed findings simply adds to this duty.[7]

*833 2. Mother's conduct after the alleged abandonment period

A parent's conduct after a petition is filed can be relevant to determining whether the parent intended to abandon a child. See In re Adoption of H.M.C., 11 S.W.3d 81, 87 (Mo.App.2000) ("When determining whether abandonment has occurred, the parent's intent, an inferred fact, is determined by considering all the evidence of the parent's conduct, both before and after the statutory period"). In this case, the mother's conduct after the petition was filed is also inconsistent with a finding of abandonment.
To find abandonment, the parent must have the ability to communicate and visit the child but choose not to do so. § 211.447.2(2)(b), RSMo Supp.2009. Further, "a finding of abandonment is incompatible with a situation where a child has been taken from a parent involuntarily." In re C.J.G., 75 S.W.3d 794, 801 (Mo.App. 2002). Specifically, "the forced separation operates to create the very circumstances, i.e., lack of communication and visitation, complained of in the termination proceeding." Id.
Here, the mother was separated involuntarily from her son when she was incarcerated. Additionally, the mother wanted to visit her son and contacted the adoptive parents' attorney regarding visitation. Because the mother was incarcerated, she had to rely on third parties to bring her child to the prison for visitation or to permit communicative access to him. Neither the adoptive parents nor their attorney attempted to find the mother in the federal system despite their knowledge that the mother was convicted of a federal crime and the name under which she was incarcerated. Neither Mr. Walter nor Ms. Davenport had any trouble locating the mother under that name. But none of the court notices were sent to that name, and none found the mother.
The mother did the one thing she could do to communicate with her child. When Mr. Walter visited her in late October 2007, she sent a letter to the court, discussed above, telling the court she wanted to visit with her son while she was in prison. Though filed with the court, and addressed to it, this letter simply was ignored. This letter also is entirely consistent with the mother's September 9, 2007, statement to Ms. Davenport in which the mother rejected outright Ms. Davenport's suggestion that the child be placed for adoption. Additionally, in August 2008 and again in September 2008, the mother repeated her opposition to adoption. Therefore, both during and after the alleged but unproven 60-day abandonment period, the mother consistently maintained her conviction that she wanted to raise her son. Again, the principal opinion's choice not to consider these facts is inconsistent with this Court's duty in termination cases to "examine the trial court's findings of fact and conclusions of law closely." K.A.W., 133 S.W.3d at 12.
Finally, here, the Court is aware because of the showing made on appeal in support of the claim of ineffective assistance that there is specific documentary evidence showing that the evidence presented at the trial by Ms. Davenport, and which almost entirely forms the basis of the findings, simply is untrue. A transcript of her conversation with the mother shows that the mother did not show surprise at the fact that her son had moved from the brother's house to the sister's house, that in fact she spoke with her sister weekly and was making arrangements for her son to return to Guatemala *834 before the adoption petition was filed, and that the telephone records from the jail confirm these calls. The facts repeated with such starkness by the principal opinion simply are not accurate. Shutting this Court's eyes to the contrary evidence when deciding whether the judgment results in a manifest injustice does not negate its existence.
The circuit court's issuance of a judgment that contains so many factual misstatements is undoubtedly in large part due to its wholesale adoption of proposed findings of fact and conclusions of law prepared by counsel for the adoptive parents. It is not unusual for one party to present the court with proposed findings of fact and conclusions of law, and as "`long as the court thoughtfully and carefully considers the parties' proposed findings and agrees with the content, there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties.'" Zink v. State, 278 S.W.3d 170, 192 (Mo. banc 2009), quoting State v. White, 873 S.W.2d 590, 600 (Mo. banc 1994). Here, however, it is evident that such thoughtful and careful consideration of the party's proposed findings did not occur, for the record in this case simply does not support the findings made concerning what reports were made, what process was provided and what the evidence showed. The record does not contain clear, cogent and convincing evidence supporting the circuit court's decision to terminate the mother's parental rights. For this reason alone, the judgment should be reversed.

C. Manifest Injustice
It is particularly troubling that the principal opinion uses the testimony about living conditions at the sister's home to support its conclusion that manifest injustice has not resulted from: the circuit court's approval of placement and transfer of the child by a person not authorized to do so by section 453.014, RSMo 2000, and 453.110, RSMo Supp.2010; the lack of five days notice to the mother of the custody transfer proceeding in violation of Rule 44.01(d); the lack of appointment of counsel for the mother until two months after the proceeding in which custody was transferred or of counsel who communicated with the mother until eight months after the proceeding, and the failure to undertake an investigation of the situation of the mother or of the adoptive parents before transferring custody in violation of sections 453.110.1 and 453.110.2.
The fact that the mother was incarcerated, had scarce resources and was poor is not in itself a basis to find neglect or to terminate parental rights; were it enough, a large number of American parents would forfeit their parental and custodial rights. Neither Ms. Davenport, the Velascos nor any agency attempted to get the circuit court to acquire jurisdiction over the child due to his living circumstances. In fact, no attempt was made to take custody of the sister's or brother's children, one of whom also was an infant. It was only the mother's son who was taken. No justification for such failure to comply with clear statutory requirements appears. While I agree that these failures did not deprive the court below of jurisdiction, the case is in this Court on direct appeal, and those failures render the judgment below manifestly unjust and unsupportable and require reversal.
The principal opinion also blames the mother for failing to bring these errors to the court's attention at an earlier stage. The reasons for not doing solack of appointed counsel who was competent and unconflicted as well as lack of receipt of the notices or lettersis self-evident. While the principal opinion suggests that *835 the mother had no right to counsel unless she requested it, even were that the case the opinion also acknowledges that Missouri cases have held that there is such a right. It is unreasonable to require the mother to second-guess those opinions to retain custody of her son. Such uneven application of statutory requirements itself is unconstitutional. Lee v. Kemna, 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002). In any event, the record is clear that the mother did not receive the statutory five-day notice of the custody hearing and so would not have had time to request counsel before it was held. There is also substantial evidence in the record from Mr. Walter that the mother did not get the summons. Further, as the principal opinion notes, counsel finally was appointed for her two months after the custody hearing. Surely the principal opinion is not stating that at that point (had counsel been effective) it would have been too late to correct the errors in the change of custody process. There is, therefore, absolutely no basis to suggest, as the principal opinion nonetheless does, that the mother brought her loss of her son on herself by not requesting counsel. Even were such a request necessary, she had counsel, although he did nothing, and so a failure to request counsel cannot be blamed for any delay thereafter. See § 453.030.12.

II. STATUTORY VIOLATIONS
It is not surprising that the mother suffered an adverse judgment even though there was not clear, cogent and convincing evidence warranting termination of her parental rights. She had no counsel for nearly two months after the petition was filed, and the counsel then appointed apparently did literally nothing until even opposing counsel realized someone else needed to be appointed. Unfortunately, opposing counsel hand-selected the mother's new counsel and directed him how to represent his client and what to do and not to do. Compounding this problem was the circuit court's failure to require compliance with basic statutory safeguards designed to ensure that judgments terminating parental rights are based on clear, cogent and convincing evidence. Instead, the record plainly reflects repeated failures to follow basic statutory requirements in this case. The principal opinion thoroughly details these failures.
First, in addition to and to elaborate on the failures noted by the principal opinion, it is clear that the Velasco family had absolutely no legal authority to place the child with the adoptive parents. Section 453.014.1 provides that a child may be placed for adoption by the division of family services, the child's parents, or by an attorney, physician or clergyman of the parents. The Velascos are none of these. They legally had no power to transfer custody of the child. To hold otherwise would relegate children to the status of chattel, free to be passed around as strangers see fit. That, of course, is not the law.
Second, the mother was given no notice of the transfer of custody hearing, in violation of Rule 44.01(d). The petition was served on her October 15, 2007, and the transfer of custody hearing was held October 18, 2007. The caption on the notice of hearing indicates that only the guardian ad litem and counsel for the adoptive parents received notice of the transfer of custody hearing. The mother's name was not on the notice, and no attorney was noticed on her behalf. The net result of this basic failure of process meant that the mother, incarcerated in a foreign country and without legal representation, lost custody of her child without being afforded the basic right to have even the option of challenging the plainly illegal transfer of custody. Courts do not tolerate the entry of a judgment *836 without proper notice in cases involving money or property. Jones v. Flowers, 547 U.S. 220, 234, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006). It is unconscionable to tolerate the lack of basic process when parental rights hang in the balance.
Third, the mother was not appointed counsel until two months after the hearing regarding the transfer of custody was held, in violation of section 453.030.12, and there was absolutely no evidence that the initial counsel tried to contact the mother or whether she knew an attorney had been appointed for her. In child custody cases, time is of the essence for the simple fact that the longer the natural parent is without custody, the more difficult it is to challenge allegations of abandonment and prove that the child's best interests are served by a continuation of the natural parent-child relationship.
Fourth, there was no evidence that the adoptive parents were licensed foster parents, pursuant to section 210.486, RSMo 2000; therefore, they were not even eligible to seek adoption under section 210.566.4(1), RSMo Supp.2010. In fact, the court made no effort to see that the reports required under chapters 453 or 211 were filed or the correct home studies made. Instead, it merely adoptedwithout independent analysis or verification the proposed findings presented by the adoptive parents stating falsely that all requirements had been met. This, again, is evidence of a failure of the court to conduct the required independent analysis of the proposed findings before adopting them.
To finalize an adoption, a court must hold an adoption hearing to determine whether the adoption shall be finalized. § 453.080.1, RSMo 2000. The court shall review the post-placement assessment, review the financial affidavit, and review the recommendations of the guardian ad litem, the person placing the child, the person making the assessment and the person making the post-placement assessment. Id. The post-placement assessment "shall include an update of the preplacement assessment... and a report on the emotional, physical, and psychological status of the child." § 453.077.1, RSMo 2000.
The post-placement assessment submitted by the guardian ad litem does not include any comments regarding the child's emotional or psychological state. Further, it indicates that the adoptive parents and the child were living in the same residence in which the adoptive parents had been living at the time of the pre-placement assessment. The pre-placement assessment, however, explicitly stated that the home did not meet the required safety regulations, and until the home met the regulations, the adoptive parents could not be considered for licensure as foster or adoptive parents. The adoptive mother's testimony at the adoption hearing confirms that, at the time of the hearing, the home still did not meet the safety regulations that are necessary for adoptive licensure. Therefore, they could not be licensed as adoptive parents. This clearly conflicts with the circuit court's finding of fact that the adoptive parents have the ability to care properly for the child, as proper care includes ensuring the child's safety.
Furthermore, while the court reviewed the adoptive parents' updated financial affidavit, the financial affidavit they provided does not indicate whether the child received any counseling services and, if so, the costs of those services, nor does it include his reasonable living expenses.[8] *837 The court, without knowing all of the adoptive parents' expenses, which includes the living expenses of the child, found that their income exceeded their expenses. This finding is not supported by the evidence. Yet another statutory requirement was violated.
Fifth, section 453.110(1) provides that custody of a child shall not be transferred in the absence of a court order granting such transfer. The Velascos, who were not even authorized legally to transfer custody of the child, gave him to the adoptive parents in early October 2007. Yet the transfer of custody hearing was not held until October 18, 2007. While this error does not, standing alone, merit reversal, it is indicative of the nearly total failure to abide by the basic statutory requirements in adoption and termination of parental rights cases.
Finally, section 453.026, RSMo 2000, plainly requires that, before parental rights are terminated, there must be a report or investigation into the parent's background, history or ability to care for the child. As the principal opinion points out, this statutorily mandated report provides critical and, ideally, impartial information regarding the parent's ability and willingness to raise the child. Despite the importance of this information and the clear statutory requirement to conduct the study, no study was conducted here. Nonetheless, the circuit court's judgment states that the requisite studies were conducted when, in fact, there is not a scintilla of evidence in the record regarding any of the required studies. Given the record in this case, it appears that a study would have revealed the mother's continuing interest in and ability to care for her son. But a study was not done, and the mother's parental rights were terminated based almost exclusively on evidence presented by the adoptive parents in a judgment drafted by the adoptive parents.

III. INEFFECTIVE ASSISTANCE OF COUNSEL
Finally, the analysis of all of the above issues must be affected by the fact that counsel for the mother had an irreconcilable conflict of interest because he was sought out and hired by the adoptive parents. The inherent conflict of interest in representation of both sides in an adoption is itself sufficient to find prejudice from ineffective assistance of counsel. This Court's Rule 4-1.7 states in relevant part:
RULE 4-1.7: CONFLICT OF INTEREST: CURRENT CLIENTS
(a) Except as provided in Rule 4-1.7(b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.
Rule 4-1.7(a). This conflict can be waived only if "each affected client gives informed consent, confirmed in writing," Rule 4-1.7(b)(4), and even then only if "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." Rule 4-1.7(b)(3). No consent was *838 obtained from the mother, in writing or otherwise, to be represented by counsel selected by opposing counsel and intended to be paid by the people trying to take her son away from her. While a court ultimately may order one side of an adoption proceeding to pay the other's counsel, that is very different than being hired by opposing counsel, as any attorney involved in a contested dissolution proceeding can attest.
Moreover, even if the adoptive parents are not strictly considered also to be clients of the mother's counsel, it is a violation of Rule 4-1.8(f) to accept compensation from one other than the client unless the client gives informed consent and the one who is to pay does not interfere with the lawyer's independent professional judgment. The requirements of these sections were not complied with here.
The concern about this conflict is not merely hypothetical and certainly could not be cured by the fact that the court appointed counsel once he had been selected by the adoptive parents and had agreed to serve on their terms. While intentional misconduct is not asserted, the inappropriateness of their relationship is evident from the correspondence between counsel for the mother and counsel for the adoptive parents, filed on appeal in this Court. A letter sent by the adoptive parents' counsel June 17, 2009, thanks the mother's counsel for taking the case, tells the mother's name to her counsel and sends him what the adoptive parents' counsel believes to be the relevant documents beyond those in the case file. On June 24, 2008, the adoptive parents' counsel then sent a letter that stated:
After speaking with you, it is now my understanding it is your intent to try to communicate with your client by letter first before going to visit her. Again, I am not requesting any information about attorney/client privileged contact you have with her, but I would appreciate you keeping me informed as to whether she does get back to you. My expectation would be that if she does not (as [prior counsel] said she did not get back with him) then I would not think that a trip to see her would be necessary. Also, if you do develop a dialogue, it may not be necessary to see her if you can communicate by mail, therefore by saving my clients money (particularly if she is agreeable to consenting to the adoption). In that regard, I am sending you another Consent to Adoption ... I mentioned to you on the phone that I have been in your situation many times as several attorneys in Missouri contact me to represent biological parents in this geographic area, particularly those who are incarcerated. As such, I have developed somewhat of a "script" to assist me in these sometimes rather difficult meetings. Sometimes, of course, the biological parent realizes that the children [sic] is better off with someone else and the meeting is quick. Other times, it takes soul searching for the biological parents to do the right thing... Thank you for your attention to these matters. My script, as I mentioned, is enclosed.
(emphasis added).
This correspondence makes evident that counsel for the adoptive parents not only hired the mother's counsel but actually chose what documents to send him, told him that the purpose of the hiring was to be sure that the mother could not attack the adoption later, gave him a script to use when writing or conversing with the mother, asked to see copies of correspondence with the mother, and suggested that counsel determine if he could avoid visiting the mother in person as that would save the *839 adoptive parents some money.[9] And, in fact, counsel did not go see the mother, much less obtain a deposition at which she could explain her side of the story. He did not even obtain an affidavit from her to counter Ms. Davenport's testimony about their jailhouse conversation and living circumstances, although the later-obtained transcript of that jailhouse conversation shows that the mother never expressed surprise that her son was in her sister's care. In fact, the mother's jail telephone records showed she was in weekly contact with her sister's home.
Neither did counsel speak with any of the mother's family or bring themor even the Velascosto testify in court or by deposition as to their care for the child and the way in which he was taken from them when the Velascos placed him with the adoptive parents in violation of statute. Counsel made no attempt to get the mother the visitation she was requesting. He did not even ask for a continuance to try to obtain any of this evidence or any other evidence.
Counsel simply appeared at the hearing after a single telephone call with the mother, introduced a single letter from her and cross-examined the adoptive parents' witnesses. Even in that regard, he failed to object to their hearsay statements, and that failure was prejudicial for it is the only evidence cited that the mother did not choose to have her son be cared for by her family or that there was a lack of communication during the 60-day abandonment period. Counsel failed to object to the lack of proper service, to the lack of notice of the custody hearing, to the failure to comply with the statutory requirements for an independent investigation and the many other statutory violations. Counsel failed even to appeal from the judgment. Only because outside pro bono counsel learned of the mother's situation shortly before the time for filing a late notice of appeal had run is the mother even in this Court. Counsel's ineffectiveness is patent on the record and requires reversal of the judgment below.
The adoptive parents seek to strike the evidence that shows that the mother was in contact with her son and made calls from prison, as well as the transcript showing that Ms. Davenport simply lied when she said the mother was surprised that her son was living with the sister. The mother is entitled to effective assistance of counsel, however, and this Court's rules provide no forum for her to show such ineffectiveness as there is no adjunct or collateral proceeding in termination cases in which such evidence can be presented. Compare Rule 24.035 and Rule 29.15 (specifically providing for post-conviction hearings in criminal cases to address ineffective assistance claims).
Where, as here, the information about incompetence has been discovered while the case is on appeal, it was appropriate to file it in this Court to support a claim of ineffective assistance. Often this might result in remand for a hearing on counsel's effectiveness or, as the principal opinion notes, where necessary this Court could appoint a master to consider this evidence. In this case, however, it is appropriate to consider this evidence and reach the issue of ineffectiveness now, as its consequences so permeated the trial that a sufficient understanding of that trial cannot be had without considering it and the resulting prejudice. Yet, even were it not considered, *840 counsel's inherent conflict and inadequacy of representation and the resulting prejudice are patent on the record. As the principal opinion notes:
In prior cases, the effectiveness of a birth parent's counsel in a termination of parental right[s] proceeding was apparent from the record, so the court of appeals was not required to adopt a mechanism for resolving factual disputes regarding the effectiveness of TPR counsel. In re C.N.W., 26 S.W.3d 386, 393 (Mo.App.2000) overruled for other reasons by In re M.D.R., 124 S.W.3d 469, 472 n. 3 (Mo. banc 2004); In re J.M.B., 939 S.W.2d 53, 55-56 (Mo.App. 1997); In re J.C., 781 S.W.2d 226, 228-29 (Mo.App.1989).
Principal Op. at 820 n. 22. These principles are directly applicable here and should require reversal. Indeed, I believe that the decision not to consider this ineffectiveness lies at the heart of the different approaches and results of the principal opinion and the dissents.

IV. CONCLUSION
The repeated, open, obvious and evident errors, combined with the ineffective assistance of counsel, set the stage for the factually erroneous judgment depriving the mother of her relationship with her son. One of the tragedies of this case is that, because of the prolonged litigation, the child is now four years old. He has had no visitation with his mother since he was an infant. Nevertheless, under the statutory scheme adopted by our legislature and the constitutional rights guaranteed to all, the mother's parental rights may not be terminated based on the length of time the system has taken to vindicate her legal rights. Clear, cogent and convincing evidence for separating the mother and her son has not been shown. They are entitled to be reunited. The judgment must be reversed.
MICHAEL A. WOLFF, Judge, concurring in part and dissenting in part.
The tortuous path to the decision in this caseas is said of the road to hellmay be paved with good intentions. But good intentions are not enough to justify what has happened in the course of this case, now in its fourth year.
The courts of this state, including this Court, and our treasured adversarial system of justice have failed this child, and his birth mother, and have ensured that, whatever the ultimate outcome, hearts will be broken.[1]
The United States Constitution requires respect for the rights of the birth mother. The constitution's commands are fundamental; they are explicitly referred to in our statutes governing termination of parental rights. Judge Stith's analysis of this point is excellent and need not be repeated here. The law does not allow the government to act on an assumption that one family would be better than another, for to do so would be to authorize the courts to take away the children of the poor and give them to the rich and to take the children of foreign-born parents and give them to native-born American families.
The failures in this case are in at least five categories:

1. The failure of due process.
*841 The record shows that the mother was served with process of the adoptive parents' petition on October 16, 2007. At the time, she was incarcerated for violating federal immigration laws, in the St. Clair County jail, 92 miles from Carthage where she was living and working at the time of her arrest. She did not, however, receive notice of the October 18, 2007, circuit court hearing transferring custody to the adoptive parents.
When she did receive court documents, they were in English, the official language of Missouri. See MO. CONST. art. I, sec. 34. It appears that at least one person was available in the jail to write a letter on the mother's behalf as she wrote a letter dated October 28, 2007, asking that her son not be adopted, that he be placed in foster care and that she receive visitation. The circuit court, however, did not even note that this letter existed, either in its judgment terminating parental rights or in its judgment of adoption. Does the mother's delay in responding to the adoptive parents' petition mean, as the circuit court infers, that she has no interest in her child? Or is her delay a signal that she was trying to understand what was going on but it took time to find an interpreter and have the letter translated?

2. The failure of the adversarial system and the effect of the consular treaty.
The failure of due process stems not only from the deficiency of notice and opportunity to be heard but also from the failure of the adversarial system. Judge Stith's opinion thoroughly sets forth the failures of counsel to provide even the most basic legal representation. That no counsel was appointed for the first two months made it difficult for the mother to protest the inadequacy of the notice she was provided. When the court finally appointed counsel for her, the representation was grossly inadequate. Even opposing counsel, representing the proposed adoptive parents, recognized the deficiency. The adoptive parents' counsel sought to remedy this inadequacy by hiring a lawyer for the mother. Judge Stith is correct as to this lawyer's conflict of interest as well as the inadequacy of the representation that obviously resulted from the conflict.
The problem of getting legal representation, or any effective assistance, for foreign nationals who face these difficulties might be solved in some cases by adhering to the provisions of the consular treaty to which the United States and Guatemala are parties. The Vienna Convention on Consular Relations requires the United States to notify a foreign national minor's consulate "without delay" whenever it is considering the appointment of a guardian. Vienna Convention on Consular Relations, art. 37, Apr. 24, 1963, 21 U.S.T. 77.[2] A child only is considered a "foreign national" when he is not a United States citizen. Because the child here was born in the United States, no notification technically is required, even though Guatemala also considers *842 him a citizen. The United States Department of State, however, notes that "allowing consular assistance will be particularly important in cases involving children, including those with two nationalities. . . ." U.S. Dep't of State at 12-14.
The State Department's recommendation should be followed. Notification is important because "[c]onsular officials are in a unique position to assist courts and other competent authorities in determining what is in the best interests of a foreign national minor. . . ." U.S. Dep't of State at 35. Consular officials may be able to help locate family of the child either in the United States or in the child's country of citizenship who can act as the child's guardian, provide information about cultural differences between their country and the United States, provide information about resources that are available in their country to assist the child, obtain relevant documentation about the child and/or the child's family, and arrange for legal representation for the child and/or the child's foreign-national parent(s) if necessary. See id.
I do not fault the circuit court or counsel for not observing the existence of this treaty, because, frankly, I am aware of no steps the state of Missouri or our court system has taken to bring this to the attention of local courts. Because there are tens of thousands of foreign nationals working in Missouri, however, problems such as this are likely to recur.[3] We should view the consulates of foreign governments as sources of help in these situations. See In re the Interest of Angelica L. and Daniel L., 277 Neb. 984, 767 N.W.2d 74, 89-96 (2009); id. at 96-97 (Gerrard, J., concurring).

3. The failure of the record to support the circuit court's findings.
The trial record reflects the failure to have a true adversarial proceeding. Judge Stith's opinion painstakingly explains the shocking lack of support in the record for much of the circuit court's findings.

4. The failure to adjudicate this case timely.
When the proceedings in this case started, the child was 11 months old. He is now 4 years and 3 months old.
Section 453.011, RSMo Supp.2007, declares the public policy of this statethat these cases must be expeditedin unmistakable terms.[4] In subsection 3, the statute says:

*843 It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding, a placement proceeding, or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties, but that the rights of the child to permanency at the earliest possible date be given priority over all other civil litigation other than children's division child protection cases.
(Emphasis added).
I attach to this opinion an appendix with a timeline of significant events, taken from the record and from the docket entries in the circuit court, in the court of appeals and in this Court. The timeline documents the shameful pattern of delay and pettifogging that characterizes this case.
Much of the delay in this case has been caused by the lawyers, with the courts' indulgence. For instance, the second "appointed" counsel for the mother, paid for by the adoptive parents, did not appeal. It was several months later that a new attorney heard about the case, entered an appearance pro bono and had to bring the matter to this Courta process that took additional monthsjust to get permission for a late appeal.
I include this timeline not to embarrass our courts or members of the legal profession, but as a reminder of how far we have strayed from the law's command that this case be decided expeditiously. Justice delayed surely is justice denied.

5. The principal opinion's stretch to find evidence of neglect.
The principal opinion stretches the circuit court's findings to allow the adoptive parents to present evidence of neglect on remand. The principal opinion says that the circuit court's findings on neglect were simply "inconsistent." No inconsistency exists; the circuit court did not find neglect for the statutory period. The circuit court's judgment says that, under section 453.040(7), RSMo 2000,
the consent of the biological parents is not necessary because the biological mother and father of the child have for a period of at least sixty days immediately prior to the filing of the Petition for Adoption, willfully abandoned the child and have willfully, substantially and continuously neglected to provide the child with necessary care and protection.

(Emphasis added). But section 453.040(7)[5] requires a finding of neglect for six months prior to the filing of the petition for adoption, which the circuit *844 court did not find and, under the evidence on the record, could not find.
At best, the circuit court's finding can be read as finding the mother neglected to care and provide for her son for 60 days prior to the filing of the adoption petition, even though the adoptive parents' brief specifically notes that there was "no underlying abuse or neglect case." Further, the adoptive parents' argument to this Court under section 453.040(7) is focused entirely on the subject of abandonment; they make no assertion of neglect under this section. Nevertheless, the principal opinion, in an apparent attempt to give the adoptive parents a leg-up in the proceedings below, seems to give the adoptive parents the opportunity to proceed on neglect.
But this is not possible. A finding of neglect under section 453.040(7) typically is "a question of an intent to forego `parental duties,' which includes both an obligation to provide financial support for a minor child, as well as an obligation to maintain meaningful contact with the child." In re C.M.B., 55 S.W.3d 889, 894 (Mo.App.2001). The mother was providing financial support for her son up until the day she was arrested on May 22, 2007. The adoptive parents, however, were required to show lack of financial support beginning April 16, 2007, to show neglect six months prior to the filing of their petition for adoption. The only way this could be shown below is by evidence that the mother was raising her son improperly.
The principal opinion notes that the mother and her son were living in a cramped one-bedroom apartment with other family members and that her son may not have received sufficient attention, was not receiving WIC services, was behind on his immunizations and was suffering from developmental delays. For this Court to believe that such evidence shows neglect as defined as "an intent to forego parental duties"is to disregard the fact that many families in the United States cannot afford a crib and other resources for their children. The principal opinion also believes that a lack of resources for the child shows that a "transfer of custody . . . urgently needed to occur." Undoubtedly, it would be wonderful if all children in the United States could grow up with their own bedroom and hours of attention from his or her parent(s) and never fall behind other children. This, however, is not the reality for many people in this country, citizens and non-citizens alike. If the legal standard calls for transfer of custody and termination of parental rights when a parent has inadequate resources to care for his or her child, an unfortunately large percentage of the children in this country could be taken from their parents.
The fundamental right of a parent to raise his or child does not allow the principal opinion's statement to be a legal standard. Where resources are inadequate, the traditional and appropriate response is for the state to step in (if neighbors, church members or communities do not) and help the parent find resources. In this case, the state never was asked to get involved. Most pertinently, no evidence exists that the mother intentionally was foregoing her parental duties in not providing her son with a crib and giving him undivided attention. What the record shows instead is a mother working at a poultry factory and trying to provide for her family as best as she could.
The principal opinion refers the decision on neglect to the circuit court. To find evidence of neglect under section 453.040(7), the circuit court would be required to find that the mother "willfully, substantially, and continuously neglected" her son for six months. The trial court, however, made the specific finding that *845 "[t]he Court is not aware of any deliberate acts toward by [sic] the child by the biological mother or anyone else that might have subjected the child to a substantial risk of physical or mental harm." It is unclear how the trial court can find willful neglect when the trial court previously has found no deliberate acts of harm toward the child.
In short, the adoptive parents presented some scant evidence of neglect that did not meet the statute's requirement; the circuit court made no finding of neglect. The doctrine of "law of the case" bars a decision on that basis on remand. See State v. Deck, 303 S.W.3d 527, 545 n. 2 (Mo. banc 2010).

Conclusion
I have great respect for my colleagues who join in the principal opinion, and I take their point that this Court has rescued this case from the abyss occasioned by the neglect of counsel. But enough is enough. A review of both the lengthy discussion in the principal opinion and of Judge Stith's separate opinion shows thateven in the absence of a true adversarial proceedingthe adoptive parent failed to prove that the mother abandoned her child. What more needs to be said or done?
The principal opinion reverses the circuit court's judgment that terminates the mother's parental rights and the adoptive parents' adoption of the child. I agree. But the majority remands the case for a new trial to start the entire case again. I dissent from the remand. This time, however, I assume there will be a true adversarial proceeding, and the requirements of the statutes will be met.
But there is no need for such proceedings. The evidence for abandonment did not grow in the nearly four years the lawyers and the courts have delayed this case. The law does not allow for the mother's child to be taken from her just because he has been in the custody of the adoptive parents for all this time. If that were the case, lawyers and courts would be encouraged to handle these cases as slowly as possiblein violation of the statutes that require expeditious treatment of these cases. Surely this Court's mandate does not authorize a simple do-over of the vital procedural steps omitted the first time aroundwith the result foreordained to be the samebut with the legal niceties observed. That, of course, may mean more motions and appeals, and if the child is not returned to his birth mother, perhaps to drag this case out well past the child's tender years. The passage of time does not make a wrong a right.
Does the principal opinion remand this case to the circuit court with the hope that the court somehow will resolve this case with the wisdom of Solomon? At least Solomon had the option to decree that the child be cut in half.[6] All we lesser judges have is the law, and it is our duty to make sure that the law is obeyed.
Not in 90 more days or 900 more days, but now.
I concur in the reversal but dissent as to the remand, and I concur in Judge Stith's opinion.

-------------------------------------------------------------------------------------------------
 APPENDIX: TIMELINE
-------------------------------------------------------------------------------------------------

*846
 Events Leading to Circuit Court Judgment of Adoption
-------------------------------------------------------------------------------------------------
DATE EVENT
-------------------------------------------------------------------------------------------------
10/15/06 Child is born.
-------------------------------------------------------------------------------------------------
05/22/07 Mother is arrested. Child is seven months old.
-------------------------------------------------------------------------------------------------
10/05/07 Adoptive parents begin taking care of child.
-------------------------------------------------------------------------------------------------
10/15/07 James Garrity appointed GAL for child. Child is one year old.
-------------------------------------------------------------------------------------------------
10/16/07 Mother served with process.
-------------------------------------------------------------------------------------------------
10/16/07 Judgment entered transferring legal custody of child to adoptive parents.
-------------------------------------------------------------------------------------------------
10/28/07 Note written by or on behalf of mother asking that her son not be adopted, that he
 be placed in foster care and that mother receive visitation.
-------------------------------------------------------------------------------------------------
11/09/07 Copy of child's passport application and letter filed on mother's behalf, written both
 in English and Spanish, objecting to the adoption and requesting visitation.
-------------------------------------------------------------------------------------------------
12/03/07 James Calton appointed counsel for mother.
-------------------------------------------------------------------------------------------------
12/11/07 Mother's notice of court appointment returned.
-------------------------------------------------------------------------------------------------
12/13/07 Adoptive parents request filed to set a hearing.
-------------------------------------------------------------------------------------------------
12/18/07 Notice of hearing filed December 18, 2007. Final adoption hearing scheduled.
-------------------------------------------------------------------------------------------------
05/02/08 Hearing continued and rescheduled.
-------------------------------------------------------------------------------------------------
06/13/08 Aldo Dominguez appointed as new counsel for mother.
-------------------------------------------------------------------------------------------------
07/18/08 Home study filed.
-------------------------------------------------------------------------------------------------
07/29/08 Mr. Dominguez first attempted to contact mother.
-------------------------------------------------------------------------------------------------
07/29/08 Updated home study filed.
-------------------------------------------------------------------------------------------------
08/13/08 Letter sent from mother to Mr. Dominguez objecting to adoption, saying contact
 with the child "has been denied" to her and that she has contacted her embassy for
 assistance.
-------------------------------------------------------------------------------------------------
08/18/08 Note written by mother attempting to give Corina Rodriguez temporary custody of
 her son.
-------------------------------------------------------------------------------------------------
09/03/08 Motion for extension of time to answer petition for adoption, transfer of custody
 and termination of parental rights filed by mother.
-------------------------------------------------------------------------------------------------
09/10/08 Final adoption hearing scheduled.
-------------------------------------------------------------------------------------------------
10/07/08 Mother's parental rights are terminated, child's name is changed and the adoption
 is sustained by circuit court.
-------------------------------------------------------------------------------------------------
10/09/08 Judgment of adoption filed. Child is nearly two years old.
-------------------------------------------------------------------------------------------------
11/08/08 Judgment of adoption becomes final for purposes of appeal.
-------------------------------------------------------------------------------------------------
 In the Court of Appeals
-------------------------------------------------------------------------------------------------
05/11/09 Motion for late notice of appeal filed by mother.
-------------------------------------------------------------------------------------------------
05/20/09 Motion for late notice of appeal denied.
-------------------------------------------------------------------------------------------------
06/04/09 Motion for rehearing filed by mother.
-------------------------------------------------------------------------------------------------
06/05/09 Motion for rehearing denied.
-------------------------------------------------------------------------------------------------
 In the Supreme Court of Missouri
-------------------------------------------------------------------------------------------------
06/09/09 Entry of appearance for mother filed by William Fleischaker.
-------------------------------------------------------------------------------------------------
06/22/09 Application for transfer filed by mother.
-------------------------------------------------------------------------------------------------
07/08/09 Adoptive parents requested to file suggestions in opposition on or before
 July 15, 2009.
-------------------------------------------------------------------------------------------------
07/23/09 Mother granted leave to file notice of appeal on or before August 24, 2009.
-------------------------------------------------------------------------------------------------
08/29/09 Notice of appeal filed by mother.
-------------------------------------------------------------------------------------------------
10/26/09 Motion to dismiss for lack of jurisdiction filed by adoptive parents.
-------------------------------------------------------------------------------------------------
10/28/09 Motion to dismiss for lack of jurisdiction overruled.
-------------------------------------------------------------------------------------------------
12/10/09 Mother's motion to declare transcripts of termination proceeding and legal file on
 appeal open for public inspection filed with service.
-------------------------------------------------------------------------------------------------
12/10/09 Mother's motion to stay appeal filed with service.
-------------------------------------------------------------------------------------------------

*847
-------------------------------------------------------------------------------------------------
12/17/09 Adoptive parents' motion for reconsideration of the denial of their motion to dismiss
 the appeal and adoptive parents' suggestions in opposition to mother's motion to
 stay appeal filed with service.
-------------------------------------------------------------------------------------------------
12/22/09 Mother's motion to declare transcripts of termination proceeding and legal file on
 appeal open for public inspection overruled.
-------------------------------------------------------------------------------------------------
12/23/09 Mother's motion to stay appeal filed with service overruled.
-------------------------------------------------------------------------------------------------
12/23/09 Adoptive parents' motion for reconsideration of the denial of respondent's motion to
 dismiss appeal overruled.
-------------------------------------------------------------------------------------------------
01/11/10 Mother's brief filed.
-------------------------------------------------------------------------------------------------
01/12/10 Motion to file supplemental legal file filed by mother.
-------------------------------------------------------------------------------------------------
01/12/10 Supplemental legal file filed.
-------------------------------------------------------------------------------------------------
02/01/10 Case transferred to the court of appeals.
-------------------------------------------------------------------------------------------------
 In the Court of Appeals
-------------------------------------------------------------------------------------------------
02/04/10 Motion to dismiss and motion to strike filed by adoptive parents.
-------------------------------------------------------------------------------------------------
02/04/10 Motion to extend time to file brief filed by mother.
-------------------------------------------------------------------------------------------------
02/05/10 Time for filing adoptive parents' brief stayed until further order of the court.
-------------------------------------------------------------------------------------------------
02/22/10 Court lifts stay on due date for adoptive parents' brief.
-------------------------------------------------------------------------------------------------
03/08/10 Request for oral argument filed by mother.
-------------------------------------------------------------------------------------------------
03/29/10 Adoptive parents' brief filed.
-------------------------------------------------------------------------------------------------
03/29/10 Supplemental legal file filed by mother.
-------------------------------------------------------------------------------------------------
04/05/10 Motion to file briefs longer than the rule allows, or, in the alternative, motion for
 leave to file corrected brief filed by mother.
-------------------------------------------------------------------------------------------------
04/06/10 April 5, 2010 motion granted.
-------------------------------------------------------------------------------------------------
04/21/10 Mother's reply brief filed.
-------------------------------------------------------------------------------------------------
05/13/10 Case docketed. Oral arguments scheduled for June 17, 2010.
-------------------------------------------------------------------------------------------------
06/10/10 Mother's reply to adoptive parents' motion to dismiss for lack of jurisdiction filed.
-------------------------------------------------------------------------------------------------
06/17/10 Oral argument held; case submitted.
-------------------------------------------------------------------------------------------------
07/21/10 Opinion is issued.
-------------------------------------------------------------------------------------------------
08/05/10 Adoptive parents' motion for transfer filed.
-------------------------------------------------------------------------------------------------
 In the Supreme Court of Missouri
-------------------------------------------------------------------------------------------------
08/27/10 Adoptive parents' motion for transfer filed.
-------------------------------------------------------------------------------------------------
09/02/10 Mother requested to file suggestions in opposition.
-------------------------------------------------------------------------------------------------
09/14/10 Adoptive parents granted leave to file reply to mother's suggestions in opposition.
 Adoptive parents' reply to suggestions in opposition filed with service.
-------------------------------------------------------------------------------------------------
09/17/10 Application for transfer granted.
  Cause ordered docketed for oral argument on November 9, 2010.
  Mother's substitute brief due on or before October 7, 2010.
  Adoptive parents' substitute brief due on or before October 27, 2010.
  Mother's substitute reply brief due on or before November 8, 2010.
-------------------------------------------------------------------------------------------------
10/06/10 Mother's brief filed.
-------------------------------------------------------------------------------------------------
10/19/10 Adoptive parents' motion for extension of time to file substitute brief and
 conditional motion to reschedule oral argument filed with service.
-------------------------------------------------------------------------------------------------
10/20/10 Court sustains adoptive parents' motion for extension of time.
-------------------------------------------------------------------------------------------------
11/05/10 Adoptive parents' substitute brief filed with service.
-------------------------------------------------------------------------------------------------
11/05/10 Adoptive parents' motion to strike mother's statement of facts filed with service.
-------------------------------------------------------------------------------------------------
11/05/10 Adoptive parents' motion to dismiss appeal for failure to file a timely notice of
 appeal and suggestions in support thereof filed with service.
-------------------------------------------------------------------------------------------------
11/08/10 Adoptive parents' motion to strike mother's statement of facts and appendix
 ordered taken with the case.
-------------------------------------------------------------------------------------------------
11/08/10 Adoptive parents' motion to dismiss appeal for failure to file a timely notice of
 appeal ordered taken with the case.
-------------------------------------------------------------------------------------------------

*848
-------------------------------------------------------------------------------------------------
11/09/10 Oral argument held; case submitted.
-------------------------------------------------------------------------------------------------
11/09/10 Mother's suggestions in opposition to adoptive parents' motion to dismiss filed.
-------------------------------------------------------------------------------------------------
11/09/10 Mother's suggestions in opposition to adoptive parents' motion to strike filed.
-------------------------------------------------------------------------------------------------
01/25/11 Opinion is issued. Child is four years and three months old.
-------------------------------------------------------------------------------------------------

NOTES
[1] The following statutory citations are to RSMo Supp.2010: Sections 211.447, 453.030, 453.070, and 453.110. All other statutory citations are to RSMo 2000. All Missouri rule citations are to Missouri Court Rules 2010.
[2] The parental rights of the putative father also were terminated under section 211.447.2(2)(b), and the trial court found his consent to the adoption was not required under section 453.040. Those provisions of the judgment were not the subject of Mother's appeal and are affirmed.
[3] Ms. Davenport is fluent in Spanish.
[4] The United States Supreme Court questioned the validity of 18 U.S.C. § 1028A, the statute under which Mother was prosecuted, in Flores-Figueroa v. U.S., ___ U.S. ___, 129 S.Ct. 1886, 1894, 173 L.Ed.2d 853 (2009). In Flores-Figueroa, the Supreme Court held that the government is required to show that defendant knew that "the means of identification at issue belonged to another person." Id.
[5] She was released from federal custody on or about February 15, 2009.
[6] During the trial, Mr. Dominguez solicited testimony from M.M. that he had not billed Adoptive Parents for the legal services he rendered to Mother. At oral arguments, the parties conceded that Adoptive Parents had paid none of Mr. Dominguez's fees.
[7] The trial court further found that the Child's biological father was not entitled to notice and service of the proceedings pursuant to section 453.060.2 because "the putative father's consent is not required under [section] 453.030.3(2)."
[8] Adoptive Parents cite to RSMo 1998 in their petition. Section 211.447 was amended in 2007 and the amended statute was effective August 28, 2007. The amendment primarily affects the numbering of the subsections and the substance of the statute remains largely the same with the exception of the addition of a new subsection 3 that requires the joinder of the juvenile officer. The petition Adoptive Parents filed on October 6, 2007, therefore, cites to the wrong version of the statute and wrong subsections. This Court has taken the liberty to correct the 1998 references in the pleading to the applicable amended subsections as published in RSMo Supp.2010.
[9] Mother does not address section 453.110.2, which provides the mechanism that a trial court should follow if transfer occurred without a court order.
[10] Mother argues in her reply brief that the lack of preservation of trial error was due to her ineffective counsel.
[11] While Mother was significantly disadvantaged by her incarceration and her inability to read and write English in these proceedings, her situation is not uniquemany other citizens and non-citizens unfortunately face the same circumstances. Mother does not cite any authority that such circumstances form a legal basis for relief.
[12] This Court has confined the term "jurisdiction" to its constitutional meaning. J.C.W. ex rel. Webb v. Wyciskalla, 275 S.W.3d 249, 254 (Mo. banc 2009). A failure to comply with statutory mandates does not deprive a court of jurisdiction to render a decision. Id.; Hightower v. Myers, 304 S.W.3d 727, 733 (Mo. banc 2010).
[13] As noted above, chapter 211 reports are not required for chapter 453 adoptions without consent unless specifically required by the chapter 453 statute.
[14] Section 453.070.1 references the pre-placement reports required by section 453.026. Section 453.026.1 requires the person placing the child into the physical custody of the adoptive parents to provide the court with a written report regarding the child.
[15] Judge Stith's separate opinion assumes that this evidence should be considered, and she substantially relies on this proffer to find insufficient evidence that Mother abandoned her Child. The separate opinion goes so far as to state that "the principal opinion has not considered any of the contrary evidence in the record itself, ... or even set out this evidence in its opinion except briefly to discredit it...." Sep. Op. at 7-8. This "contrary evidence" is not recited or relied upon because it was not before the trial court. Judge Stith's opinion does not cite to any authority that an appellate court can accept evidence outside the record as true when the opposing party has not had an opportunity to present contrary evidence or challenge the foundation, admissibility, or credibility of such evidence. The analysis in Judge Stith's opinion accepts Mother's request that this Court abandon its appellate role as well as the standard of review.
[16] The legal file contains a letter and the docket has an entry that on November 9, 2007, Wayne Walters filed a letter with the trial court stating that he was assisting Mother in getting a passport for Child and that Mother did not want Child to be adopted. Mr. Walters' letter was not stipulated to at trial or admitted as evidence. And as mentioned above, the letter has not been shown to be admissible as evidence, nor has it or its contents been subject to challenge by the Adoptive Parents. Simply filing a document with the trial court, "does not put it before the court as evidence." Wampler v. Dir. of Revenue, 48 S.W.3d 32, 35 (Mo. banc 2001). Additionally, the trial court "is not required to leaf through a file to determine what should be used as evidence." Id. Because this document was not in evidence, it will not be considered.

Judge Stith's opinion states that "a court may not always have a duty to look at the record for evidence not brought to its attention by counsel[.]" (Emphasis added). Her use of the phrase "may not always" implies that a trial court sometimes may have a duty to find relevant evidence by paging through documents filed in the trial court but not brought to its attention by counsel. The law does not recognize this exception.
Judge Stith's opinion also suggests that this Court is abdicating its duty to look closely at the findings of fact when it disregards this evidence. The proposition that this Court must examine the findings of the trial court closely comes from In re K.A.W., 133 S.W.3d at 12. That proposition was not made in the context of considering evidence outside the record on appeal or evidence in the legal file that was not offered during trial.
[17] Satisfaction of one statutory ground for termination is sufficient to sustain the judgment. In re P.L.O., 131 S.W.3d at 789.
[18] Judge Stith's opinion relies on evidence outside the record to dispute Mother's "surprise."
[19] Mother's letter to Mr. Hensley directly contradicts her assertion that she did not receive service of the petition or know how to contact anyone who would know about her Child. After the pleadings were served, she had information about the location of Child and how to contact Adoptive Parents as of October 16, 2007.
[20] This finding by the trial court includes a finding of neglect, although for a period of 60 days rather than the statutorily required six months. The judgment also includes other factual findings that would be relevant to only the issue of neglect. For example, the trial court found that the Child had been malnourished, was developmentally delayed, was behind on his immunizations, and that Mother failed to obtain a birth certificate for Child to obtain WIC services. These findings are arguably inconsistent with another finding that "[t]he Court is not aware of any deliberate acts toward by [sic] the child by the biological mother or anyone else that might have subjected the child to a substantial risk of physical or mental harm." The findings by the trial court relevant to neglect are also inconsistent with a statement in Adoptive Parents' brief that "this was no underlying abuse or neglect case." In any event, Mother only challenges the trial court's finding of abandonment and does not claim insufficient evidence to support the trial court's findings regarding neglect as a basis for not requiring Mother's consent to the adoption under section 453.040(7). Accordingly, this Court will examine the sufficiency of only the evidence of abandonment because Mother's challenge to sufficiency is limited to abandonment. Any confusion over whether the Adoptive Parents are proceeding, in fact, on their alternatively pleaded ground of neglect can be resolved on remand. Ross v. Clouser, 637 S.W.2d 11, 14 (Mo. banc 1982); Butcher, 426 S.W.2d at 357.
[21] At the time the petition was filed, Child was 11 months old.
[22] A substantial portion of Mother's appendix contains evidence to substantiate her claim of ineffective assistance of counsel. She included this evidence to demonstrate to the Court the evidence she could present to a trier of fact that would adjudicate the issue of her counsel's effectiveness. In prior cases, the effectiveness of a birth parent's counsel in a termination of parental rights proceeding was apparent from the record itself, not evidence proffered outside the record, so the appellate court was not required to adopt a mechanism for resolving factual disputes regarding the effectiveness of TPR counsel. In re C.N.W., 26 S.W.3d 386, 393 (Mo.App.2000) overruled for other reasons by In re M.D.R., 124 S.W.3d 469, 472 n. 3 (Mo. banc 2004); In re J.M.B., 939 S.W.2d 53, 55-56 (Mo.App. 1997); In re J.C., 781 S.W.2d 226, 228-29 (Mo.App. 1989). Other states that have addressed the issue have remanded the matter for hearing in the trial court. E.g., In re A.L.E., 248 Ga.App. 213, 546 S.E.2d 319, 325 (2001). The appointment of a special master also would be a potential mechanism for an appellate court to resolve any factual disputes. Rule 68.03. Because reversal on other grounds renders it unnecessary for this Court to reach the issue of the effectiveness of Mother's trial counsel, it does not determine how factual disputes regarding effectiveness of counsel in a TPR case should be resolved. Because her proffered evidence has not been presented and found truthful by a trier of fact, this Court cannot consider such evidence.

Judge Stith's argument that Mr. Dominguez's representation of Mother was directed by the Adoptive Parents' counsel and, therefore, ineffective, is premised on information found in Mother's appendix, which is outside the record on appeal. Sep. Op. at 28-29. Her reliance on In re C.N.W., In re J.M.B. and In re J.C. is misplaced because, in those cases, the court of appeals looked only at the record. 26 S.W.3d at 393, 939 S.W.2d at 55-56, 781 S.W.2d at 228-29. Her consideration of this material is not supported by these cases.
[23] Section 211.447.2(2)(b) states:

2. Except as provided for in subsection 4 of this section, a petition to terminate the parental rights of the child's parent or parents shall be filed by the juvenile officer or the division, or if such a petition has been filed by another party, the juvenile officer or the division shall seek to be joined as a party to the petition, when:
* * *
(2) A court of competent jurisdiction has determined the child to be an abandoned infant. For purposes of this subdivision, an "infant" means any child one year of age or under at the time of filing of the petition. The court may find that an infant has been abandoned if:
* * *
(b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]
(Emphasis in original).
[24] Judge Stith's opinion, which relies heavily on facts outside the record, departs from the rules of this Court and is not supported by the law.
[25] Every member of this Court agrees that this case is a travesty in its egregious procedural errors, its long duration, and its impact on Mother, Adoptive Parents, and, most importantly, Child. The dissenting members of this Court rely significantly on information outside the record to find that Mother has been victimized repeatedly and that her rights have been violated. The dissenting members believe passionately that custody of Child should be returned to Mother without further proceedings. That result can be reached only by disregarding the law.

The majority of this Court, instead, grants relief for the proven errors as permitted by law. Yet, this Court, in fairness, exercised its discretion as allowed by law to ensure that Mother receives her right to a trial on the merits, with effective counsel, that comports with the statutory requirements. This Court was not required by law to allow Mother to file her appeal out of time, nor was this Court required by law to review the Mother's unpreserved errors by plain error review.
This Court makes no suggestion as to who will or should prevail on remand. Rather, this opinion ensures that both Mother and Adoptive Parents will have a full and fair trial that respects Mother's fundamental rights and the best interests of the Child.
[1] No one has contested or appealed the termination of the unidentified father's parental rights, and that aspect of the judgment would remain in place.
[2] See In re Adoption of N.L.B., 274 S.W.3d 619, 627 (Mo.App.2009).
[3] See, e.g., In re the Marriage of A.S.A., 931 S.W.2d 218, 222 (Mo.App. 1996) ("`substantial evidence' as the term is used in Murphy v. Carron, means `clear, cogent, and convincing evidence'"); In the Interest of M.J.A., 826 S.W.2d 890, 897 (Mo.App.1992) ("In a parental rights termination case, `substantial evidence,' as the term is used in Murphy v. Carron, means `clear, cogent, and convincing evidence'")
[4] Moreover, even were the hearsay evidence barely sufficient, the fact that it was admitted without objection by the mother's conflicted counsel, in addition to his other record failures to investigate or present the mother's side of the case and his inherent conflict as shown by his communications with opposing counsel and their direction of the degree and nature of his representation, requires a finding of ineffectiveness.
[5] As explained in detail below, even if the actions of the brother and sister are attributed to the mother for purposes of the abandonment analysis, the record demonstrates that the mother did not abandon her son prior to August 6, 2007. Indeed, the record demonstrates that the mother never abandoned her child.
[6] In any event, any failure of the mother's family to follow through with her son's care while she was incarcerated cannot be evidence of willful abandonment by the mother.
[7] Contrary to the implication of the principal opinion, this discussion is based entirely on record evidence, albeit evidence ignored by the circuit court. True, there is much non-record evidence included in the appendix to support the mother's claims of ineffective assistance of counsel that counters the claims of abandonment, as discussed in section III below. I share the principal opinion's concern about assuming the truth of this evidence for purposes of abandonment issues absent a hearing at which it can be contested, even where, as here, they are third-party records that no one claims were fabricated. But I disagree that in deciding whether a manifest injustice occurred, and in deciding whether there was ineffective assistance of conflicted counsel, these records are irrelevant. To the contrary, the very failure to produce these existing records at trial demonstrates the ineffectiveness of the mother's counsel, for it shows his lack of investigation. Regardless of whether ultimately accepted as accurate, the very existence of these records provides notice that the hearsay testimony of Ms. Davenport and the adoptive parents is contested and, therefore, entitled to even less weight than it otherwise might be accorded.
[8] The law requires the financial affidavit to include any medical expenses, counseling service expenses for the child, pre-placement and post-placement assessment expenses, reasonable legal expenses connected with the adoption, and "reasonable living expenses, including but not limited to food, shelter, utilities, transportation or clothing expenses of the ... child." § 453.075.1, RSMo 2000.
[9] Counsel for the Adoptive Parents stated at oral argument that counsel for Mother ultimately did not take any pay for his work. It is laudable that counsel saw the inappropriateness of being paid by the opposing side, but does not change the fact that at the time of the representation he was in the employ of the other side.
[1] The custom, as observed in this case, is to use the parties' initials. I would prefer their names as a reminder that the child and his birth mother are real people. It appears that the birth mother and the adoptive parents have disclosed their identities. The adoptive parents are also real people with a great generosity of spirit that is evident in their willingness to adopt a child.
[2] "Whenever a [court] considers appointing a guardian or trustee for a foreign national who is a minor or an adult lacking full capacity, a court official or other appropriate official involved in the guardianship process must inform the nearest consular officers for that national's country without delay." U.S. Department of State, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them, 10 (2010), available at http://travel.state.gov/pdf/cna/CNA_Manual_3 d_Edition.pdf (hereinafter U.S. Dep't of State). The Supremacy Clause specifies that "all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2.
[3] The deep ambivalence to the subject of illegal immigration is shown by the difference in legal treatment between those who hire such workers and the workers themselves who come to the United States intending to create a better life. The punishment is harsh for immigrants such as the mother here, many of whom pay large sums to human traffickers known as "coyotes" to transport them to the United States for work in jobs such as those available in poultry-processing plants. In contrast, the requirement that employers verify legal documentation is minimalenabling them to express "shock" when a workplace is raided by federal immigration agentsthe "shock" that there are undocumented workers in their largely Spanish-speaking workforces.
[4] The statute contains specific scheduling requirements to ensure that the cases be decided as expeditiously as possible. Section 453.011.1 provides:

In all cases involving the termination of parental rights, placement, or adoption of a child, whether voluntary or contested by any person or agency, the court shall, consistent with due process, expedite the termination, placement, or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over other civil litigation, other than children's division child protection cases.
Section 453.011.2(2) provides:
The appellate court shall, consistent with its rules, expedite the contested termination of parental rights or adoption case by entering such scheduling orders as are necessary to ensure that a ruling will be entered within thirty days of the close of oral arguments, and such case shall be given priority over all other civil litigation, other than children's division child protection cases, in reaching a determination on the status of the termination of parental rights or of the adoption[.]
[5] Section 453.040(7) provides:

The consent to the adoption of a child is not required of . . .
A parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglect to provide him with necessary care and protection[.]
(Emphasis added).
[6] I refer to the Biblical story of Solomon adjudicating the case in which two women each claimed to be a child's mother. Solomon deemed the woman who protested his decree to be the real mother because she begged him to give the child to the other woman rather than to cut the child in half. 1 Kings 3:16-27.